W. J. PATTERSON *et al.* Appellants, *vs.* B. W. PATTERSON *et al.* Appellees.

*Opinion filed June 20, 1911—Rehearing denied October 13, 1911.*

1. EVIDENCE—*when alleged declarations are incompetent, as hearsay.* Alleged declarations of deceased grantors, out of the presence of the grantee and against his interest, are mere hearsay, and are not admissible against the grantee in a suit by the heirs and legatees of the grantors to establish that the deed, which was an absolute warranty deed, was merely a part of a mortgage transaction.

2. SAME—*chancellor is presumed to have considered competent evidence, only.* Upon appeal in a chancery case, where incompetent evidence has been admitted over objection, it is presumed the chancellor disregarded such evidence and considered only the competent evidence in determining the issues presented for decision.

3. SAME—*alleged rebuttal evidence not tending to rebut anything should be disregarded.* Alleged rebuttal evidence introduced by the complainants in a chancery case which does not tend to rebut anything adduced by the defendant, should be, and on appeal will be presumed to have been, disregarded by the chancellor.

4. SAME—*what does not show who was in possession of land.* Evidence tending to show that the grantee in a warranty deed from his father and mother permitted the mother to enjoy the rents and profits of the land for the time she survived the father does not show who was in the actual possession of the land during that time.

5. SAME—*what does not overcome the force and effect of deed.* The facts that the grantor in a warranty deed to his son had on several previous occasions made deeds to his various sons in order to obtain loans on the land without mortgaging it himself, and that the sons re-conveyed the property when the loans were paid; that he had on one occasion forgotten to record a deed making a re-conveyance; that the grantor and his wife, in their lifetime, were permitted by the grantee to receive the rents and profits, and that the grantee was not heard to make any claim of ownership under the deed while the grantor and his wife lived, do not overcome the force and effect of the deed.

6. JUDGMENTS AND DECREES—*when decree dismissing bill may make finding as to ownership.* Where one of the issues under a bill for injunction and other relief is whether a warranty deed is an absolute deed or part of a mortgage transaction, it is not improper, upon dismissing the bill because the complainants have an

adequate remedy at law, for the decree to find that the deed is what it purports to be and that the grantee is the owner of the land conveyed.

7. SAME—*when the decree should make no finding concerning claims.* Where a bill seeks an injunction against the prosecution of certain claims against an estate which have, by agreement, been transferred from the county court to the law side of the circuit court but not consolidated with the chancery suit, the chancellor has no power either to enter judgment or deny judgment on the claims but only to grant or deny the injunction, and if that relief is denied by dismissing the bill because the remedy at law is adequate, the decree should make no finding as to such claims.

8. INJUNCTION—*what must be shown to sustain bill to enjoin prosecution of claims at law.* In order to sustain a bill seeking to enjoin the prosecution in a court of law of certain claims against an estate, it is incumbent upon the complainants to show that they have a defense to such claims which is cognizable only in a court of equity, otherwise they will be remitted to their remedy at law.

9. CONTRACTS—*when lease and agreement will not be presumed to have been obtained by undue influence.* A lease and agreement for care, nursing and support, obtained from an aged woman by her son, who was also her confidential adviser, cannot be presumed to have been obtained by undue influence, where the evidence shows that the arrangement was fair and equitable to both parties, and that the lessor, before the confidential relation existed, insisted upon renting the land to the son at practically the same rent, which the evidence shows was not inadequate.

10. EQUITY—*courts of equity will not take over administration of estates except under extraordinary circumstances.* A court of equity will not take over the administration of an estate from the county court except in extraordinary cases, in which some special reasons are shown to exist for exercising such jurisdiction.

11. SAME—*rule as to retaining jurisdiction to grant legal remedies.* Where the evidence establishes the right to the equitable relief sought by the bill the court will retain jurisdiction for all purposes connected with the subject matter of the suit, and may, if necessary, establish purely legal rights and grant legal remedies; but if the bill is dismissed as to the portion founded on the right to equitable relief and only legal rights remain to be ascertained and passed upon, the jurisdiction of the court fails.

APPEAL from the Circuit Court of Moultrie county; the Hon. W. G. COCHRAN, Judge, presiding.

E. J. MILLER, and F. M. HARBAUGH, for appellants.

E. E. WRIGHT, JOHN E. JENNINGS, and W. K. WHIT-FIELD, for appellees.

Mr. JUSTICE COOKE delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Moultrie county, entered on October 26, 1910, in a suit brought by W. J. Patterson and others, appellants, against B. W. Patterson, (individually and as executor of the last will and testament of Margaret Patterson, deceased,) and Margaret Underwood, appellees.

The undisputed facts upon which the suit is predicated are as follows: On March 11, 1876, William M. Patterson, now deceased, was the owner of several tracts of land in Moultrie county, including the following: The west half of the south-west quarter of section 7, containing about 90 acres, and lot 2 in the north-west quarter of section 18, containing about 90 acres, both in township 13, north, range 6, east; also the east half of the east half of the north-east quarter of section 13, and 33 acres in the north-west quarter of the north-west quarter of section 36, in township 13, north, range 5, east. On that date he, together with Margaret Patterson, his wife, conveyed all of the tracts owned by him to his son Daniel M. Patterson for a nominal consideration, the purpose of this conveyance being to obtain a loan on the land, and then, by *mesne* conveyances, place the title in the name of Margaret Patterson. On the day this conveyance was made Daniel M. Patterson mortgaged all of the tracts above described, except the north half of the west half of the south-west quarter of said section 7, to the Ætna Life Insurance Company to secure a note for $2750, due in five years, the money borrowed being for the use of William M. Patterson. On the 21st day of the same month Daniel M. Patterson, at the direction of his father, conveyed all the land which had been conveyed to him by William M. Patterson to Levi Seass. William M. Patterson had agreed to give his son

B. W. Patterson, one of the appellees, the east 80 acres of lot 2 in the north-west quarter of section 18, above described, and to his son George W. Patterson the east half of the east half of the north-east quarter of section 13, above described, and 40 acres adjoining the last mentioned tract, provided each of them would assume the payment of $1000 of the said mortgage indebtedness of $2750. In pursuance of this agreement Levi Seass, on April 16, 1877, conveyed to B. W. Patterson, subject to $1000 of said encumbrance, the land given him by his father, and on the same day conveyed to Margaret Patterson, the wife of William M. Patterson, the remainder of the land which had been conveyed to him by Daniel M. Patterson. Before George W. Patterson had obtained a deed to the land which his father had given him, he sold that land to B. F. Blackwell, and September 4, 1886, Margaret Patterson conveyed this land to Blackwell, subject to $1000 of the said mortgage encumbrance, which Blackwell assumed and agreed to pay. Thereafter, in November, 1889, Margaret Patterson and William M. Patterson, her husband, conveyed to B. W. Patterson, for the expressed consideration of $2600, the land included in said mortgage to which Margaret Patterson then held the title, being the south-west quarter of the south-west quarter of said section 7, and 33 acres in the north-west quarter of the north-west quarter of said section 36, and B. W. Patterson and B. F. Blackwell then executed and delivered to the Ætna Life Insurance Company a new mortgage upon the same land to secure a new note for $2750, due in five years, given to take the place of the old note and mortgage. The mortgage given in November, 1889, was released by the insurance company in January, 1895.

When B. W. Patterson received this last deed he was living with his parents at their home farm adjoining the city of Sullivan, in Moultrie county, his wife having died in 1886, and he having soon thereafter removed, with his

two small children, to the home of his parents. His father was then quite aged and feeble, and he, after removing to the home of his parents, took charge of and farmed the land belonging to his parents, and was in possession of and farming this land when his father died, in January, 1897. After William, M. Patterson placed the title to his land in the name of his wife, as above detailed, he continued to transact all business in connection therewith until his death. After his death Margaret Patterson, who could neither read nor write, appointed her sons Daniel M. Patterson and W. J. Patterson as agents to attend to her business. They rented the land owned by their mother to B. W. Patterson, and he continued in possession, upon terms agreed upon with them, until Margaret Patterson, in December, 1899, revoked the appointment of W. J. Patterson as her agent on account of the hostility which had arisen between him and B. W. Patterson. Daniel M. Patterson was then dead, having died about one year after his appointment as such agent. Thereafter B. W. Patterson continued in possession of the land owned by his mother until her death, in March, 1909, under arrangements made with her.

Soon after her husband's death Margaret Patterson suffered a stroke of paralysis, from which she rallied within a short time and was able to walk with the aid of a cane. In 1900 she sustained a second stroke, and shortly thereafter a third stroke. From the time of the second stroke until her death she was a helpless invalid, confined to her bed and requiring the constant attendance of a nurse. Her family then consisted of herself and B. W. Patterson and his two children, and after her second stroke of paralysis, until her death, B. W. Patterson employed and paid a nurse at a weekly salary ranging from seven to nine dollars, and a servant girl at a weekly salary of from two to three dollars.

On February 27, 1907, Margaret Patterson and B. W. Patterson entered into and executed a written contract, whereby the former leased to the latter the various tracts

of land owned by her and standing in her name, and consisting of about 131 acres, for a term of ten years from March 1, 1907, at an annual cash rental of $350. The lease contained a provision that in case of the death of either party the lease should terminate on the first of March following the time of such death. By the same instrument Margaret Patterson agreed that B. W. Patterson should deduct the taxes and cost of material for repairs from the rent, and should be reimbursed at the rate of $25 per week for the necessary supplies, nurse hire, medical attendance and help furnished by him. On the day following the execution of this contract Margaret Patterson and B. W. Patterson had a settlement of their accounts to that date, and as a result of such settlement Margaret Patterson executed and delivered to B. W. Patterson her promissory note for $6550. On March 4 of the same year she executed and delivered to B. W. Patterson a note for $650, payable to her daughter, Margaret Underwood, and directed him to hold it until after her death and then to deliver it to Margaret Underwood. This note was given to compensate Margaret Underwood for services rendered in taking care of her mother during the latter's illness. On March 3, 1908, Margaret Patterson executed and delivered to B. W. Patterson her promissory note for $1173.49, and on March 2, 1909, another note for $1190.49, being the amounts found due B. W. Patterson on those dates upon settlements between him and his mother in accordance with the terms of the contract of February 27, 1907. All of these notes were by their terms due one day after date and bore interest at the rate of seven per cent per annum.

Margaret Patterson died on March 29, 1909, leaving a will, dated April 5, 1898, which was duly probated in the county court of Moultrie county. She nominated B. W. Patterson executor of her will, and directed him, as such executor, to convert all her property into cash, under the order of the county court, as soon after her death as prac-

ticable, and to distribute the proceeds among her legal heirs in the proportions therein specified. B. W. Patterson was at the time of filing the bill herein, and had been ever since the death of his mother, in possession of the real estate and had taken no steps to obtain an order to sell the same. After the bill was filed herein, and on September 5, 1910, he filed his petition in the county court and obtained an order to sell all the real estate standing in the name of Margaret Patterson at the time of her death.

On March 18, 1910, Margaret Underwood filed a claim against the estate of Margaret Patterson, deceased, for $788.27, being the amount of principal and interest due on the $650 note above mentioned. The executor having endorsed on the claim that he had no objection to its allowance and having entered his appearance, the county court, on March 24, 1910, allowed the full amount of the claim and entered judgment accordingly. Some of the heirs-at-law and legatees of Margaret Patterson prosecuted an appeal from the judgment of the county court to the circuit court of Moultrie county, and that appeal was pending and undisposed of at the time the bill was filed herein.

On April 9, 1910, B. W. Patterson filed four claims against the estate of Margaret Patterson. Three of these claims were for the principal and interest due on the respective promissory notes above mentioned which had been delivered to him by his mother, and the fourth was for taxes paid by him and the amount due under the contract of February 27, 1907, for care, nursing, etc., during the last four weeks of her life. The court appointed an administrator *pro tem.* to defend against the claims filed by the executor. Some of the heirs and legatees of Margaret Patterson appeared and objected to the allowance of these claims. This was the situation with reference to the claims filed by B. W. Patterson at the time the bill was filed herein. Thereafter, on August 9, 1910, by agreement, the venue

was changed to the circuit court of Moultrie county and the claims were transferred to that court.

On June 6, 1910, W. J. Patterson and other heirs and legatees of Margaret Patterson, deceased, filed their bill in the circuit court of Moultrie county against B. W. Patterson and Margaret Underwood, the remaining heirs and legatees, and B. W. Patterson, as executor of the last will and testament of Margaret Patterson, deceased. The bill charged that the deed executed in November, 1889, by which Margaret Patterson and her husband conveyed to B. W. Patterson the 45 acres in said section 7 and the 33 acres in said section 36, was executed by them "in connection with and as a part of a mortgage and for no other purpose, and was never intended to convey the title to said land;" that B. W. Patterson never took possession of said land under said deed during the lifetime of Margaret Patterson and never claimed any rights in, through or under said deed until after the death of his mother, and that Margaret Patterson was at the time of her death the owner of said real estate; that said deed is not now held as security for any debt; that the indebtedness was paid and satisfied by William Patterson in his lifetime and the mortgage of which the debt formed a part has been released, and that the deed is now a cloud on the title of the complainants and others interested in the estate of Margaret Patterson, deceased. The bill further alleged that the notes executed and delivered by Margaret Patterson to B. W. Patterson, including the note payable to Margaret Underwood, were without consideration, and were obtained by B. W. Patterson by means of persuasion and undue influence while said B. W. Patterson was acting as the sole confidential agent, adviser, business representative and manager for his mother and stood in a confidential relation to her and while Margaret Patterson was unable to transact ordinary business, and that B. W. Patterson held the note which was payable to Margaret Underwood until after the

death of his mother and then caused Margaret Underwood
to file the same as a claim against the estate, and, with
full knowledge of the unlawful procedure by which it was
obtained, endorsed thereon his allowance thereof and per-
mitted judgment to be rendered thereon by the county court.
The bill further alleged that the value of the 209 acres of
land which appellants claim Margaret Patterson owned at
the time of her death, and which include the 78 acres con-
veyed to B. W. Patterson in November, 1889, is $30,000
and that the annual rental thereof for the past twelve years
has been $1200, and that there is now due the estate from
B. W. Patterson, on account of rents and profits from the
land during that period, the sum of $15,000, for which he
refuses to account; that B. W. Patterson has wholly failed
to take any steps to carry out the provisions of the will of
Margaret Patterson with reference to the sale of the real
estate left by her, but has retained possession of all real
and personal property of the estate for his own gain and
profit and has failed to report his acts and doings to the
county court; that he has failed to inventory a large part
of the personal property belonging to the estate and has not
accounted for the same but has converted it to his own use.
The bill prayed, in effect, that the court find and decree that
B. W. Patterson has failed to inventory a large part of the
real and personal property belonging to Margaret Patter-
son, deceased, and has set up an adverse claim of his own;
that said claims presented by B. W. Patterson and Mar-
garet Underwood be canceled and decreed to be fraudu-
lent and without consideration and null and void and their
prosecution enjoined; that an accounting be had against
B. W. Patterson, whereby he may be compelled to account
for the rents and profits of the 209 acres of land alleged
to have been left by Margaret Patterson, from the year
1899 to the present time; that B. W. Patterson be removed
as executor of the estate of Margaret Patterson, deceased,
and that the circuit court in chancery take over the admin-

istration of said estate and appoint some disinterested and proper person to administer upon the estate and sell all of said land in pursuance of the terms of said will and distribute the proceeds as therein directed, and that complainants have such further relief in the premises as equity may require.

Issues were made up by the filing of answers and replications, and the cause was submitted to the chancellor upon the evidence taken before him in open court. A decree followed, in which it was recited that the cause came on for hearing upon the bill, answers and replications; that the court heard the testimony and documentary proofs introduced by the respective parties, and "at the same time, by agreement of the parties, heard the proof applicable to the four claims of B. W. Patterson and the one claim of Margaret Underwood against the estate of Margaret Patterson, deceased, which said claims are each pending on the common law docket of this court but not consolidated herewith." The decree found the issues for the defendant B. W. Patterson as to the 78 acres of land involved in the suit, and found that the deed through which he claimed title to the said 78 acres was not executed by Margaret Patterson and her husband in connection with and as a part of a mortgage; that said tract was not the property of Margaret Patterson at the time of her death and is not a part of her estate but that the defendant B. W. Patterson is the owner of the same. With reference to the four claims filed by B. W. Patterson against the estate of Margaret Patterson, and which the decree refers to as "now pending and undetermined upon the law side of the court," the decree contains the following provision: "And the court having heard the evidence with reference to the said four claims filed by the said B. W. Patterson against the estate of Margaret Patterson, deceased, makes no findings with reference to the merits of said claims, but the court doth find that the complainant B. W. Patterson is entitled to a

trial by jury as to said claims; and the court further finds that as to said claims of the said B. W. Patterson so pending on the law side of the docket of this honorable court, that this court desired the benefit of the advisory aid of a verdict by a jury in reference thereto." The decree further found that the alleged defenses to the said claims of B. W. Patterson are of a character that the complainants have a full, adequate and complete remedy at law. With reference to the claim of Margaret Underwood the decree found that the note which is the basis of said claim was never delivered in the lifetime of Margaret Patterson to Margaret Underwood and that Margaret Underwood is not entitled to recover upon her said claim against the estate of Margaret Patterson, and that the objections of the complainants to said claim should be and are sustained. After making the above findings, it is ordered, adjudged and decreed that the equities in the cause are with the defendants, B. W. Patterson, individually and as executor, and Margaret Underwood, and that as to said defendants the bill of complaint should be and is dismissed for want of equity, at the cost of the complainants. The decree then proceeds as follows: "It is further ordered, adjudged and decreed by the court that the objections of the complainants herein to the claim of Margaret Underwood against the estate of Margaret Patterson, deceased, be and the same are hereby sustained and judgment upon said claim is hereby denied." The costs made by the complainants in relation to the claim of Margaret Underwood are then adjudged against her and the complainants are awarded execution therefor. The complainants have prosecuted an appeal to this court and have assigned numerous errors. Margaret Underwood has assigned cross-errors questioning that portion of the decree which purports to finally dispose of her claim against the estate of Margaret Patterson.

It will be observed from the foregoing that the bill filed herein embraced several distinct matters, and that the rec-

ord has been further complicated by the action of the court in adjudicating matters not presented by the issues in the case. . While the bill does not clearly show, in apt language, the precise relief sought by the complainants, the apparent objects of the bill are, as hereinbefore indicated, first, to obtain an adjudication that Margaret Patterson was at the time of her death the owner of the 78 acres of land which had been conveyed by 'her to B. W. Patterson in November, 1889; second, to obtain an injunction restraining the prosecution at law of the claims filed by B. W. Patterson and Margaret Underwood against the estate of Margaret Patterson; third, to compel an accounting by B. W. Patterson of the rents and profits received by him from the land owned by Margaret Patterson, from 1899 to the present time; and fourth, to have the administration of the estate transferred from the probate court to the court of chancery, B. W. Patterson removed as executor and some disinterested person appointed to administer upon the estate and carry out the provisions of the will of Margaret Patterson. The decree denied all the relief sought and dismissed the bill for want of equity, but went further and decided a matter entirely outside the issues, viz., that Margaret Underwood was not entitled to recover on her claim against the estate of Margaret Patterson because the note which formed the basis for the claim was not delivered to Margaret Underwood during the lifetime of her mother.

The record is voluminous, the evidence covering 1100 type-written pages. Practically all of this evidence was presented upon the question of the ownership of the 78 acres of land in controversy and the matter of the claims presented by B. W. Patterson and Margaret Underwood against the estate of Margaret Patterson. Before entering upon a discussion of any of the questions presented upon this appeal the character of a considerable portion of the evidence upon which appellants rely should be noticed.

The transactions out of which the controversy between the parties arose were transactions between William M. Patterson and Margaret Patterson, both now deceased, and B. W. Patterson, now defending against a suit brought by the heirs and legatees of Margaret Patterson. B. W. Patterson was not a competent witness as to any of these transactions between him and his father or mother, and his testimony was confined to matters relating to the Margaret Underwood claim and to a denial of statements attributed to him by certain of the witnesses for the complainants. Appellants, while strenuously insisting upon the incompetency of B. W. Patterson as a witness at the hearing in the circuit court, introduced a large amount of testimony showing the unsworn statements of William M. Patterson and Margaret Patterson concerning these transactions, and the record abounds with self-serving statements of William M. Patterson and Margaret Patterson which witnesses called by the complainants testified had been made to them by these deceased persons during their lifetime, out of the presence of B. W. Patterson, and which we are now asked by appellants to consider in determining whether the chancellor correctly decided the issues in the case. This testimony was clearly hearsay and was therefore incompetent, and it is to be presumed that the chancellor, who heard a large portion of it subject to objections interposed by the defendants, disregarded it in determining the issues presented to him for decision.

The first complaint which we shall notice is, that the court erred in denying the relief sought with reference to the 78 acres of land in controversy and in making findings which, in effect, confirmed the title to that land in B. W. Patterson. The deed by which Margaret Patterson and husband conveyed that land to B. W. Patterson was a statutory warranty deed, without any reservations or exceptions, and purported to convey the premises to the grantee in consideration of the sum of $2600. This deed was ac-

knowledged by the grantors before T. H. Scott, a notary public, who testified on behalf of the defendants that at the time the deed was executed B. W. Patterson signed a promissory note for $2600, payable either to Margaret Patterson or William M. Patterson, which had been prepared by the witness, and gave that note in payment for the land. B. F. Blackwell, another witness, who had purchased a portion of the land covered by the mortgage to the Ætna Life Insurance Company and who was one of the mortgagors in the last mortgage to that company, testified that when the new mortgage was given William M. Patterson told him that B. W. Patterson had bought the 78 acres and had given his note for $2600, and later, in 1894, told him that B. W. Patterson had paid for the land. The deed was filed for record and duly recorded in the recorder's office of Moultrie county within a few days after its delivery. Appellants contend that the presumption arising from the recitals in and character of the deed and the force of the testimony of Scott and Blackwell are overcome by the evidence adduced by the complainants. This evidence tended to show that it was the custom of William M. Patterson to convey tracts of land to his sons W. J. Patterson and Daniel M. Patterson in order that they might execute mortgages to secure the re-payment of money borrowed for William M. Patterson, and that upon the payment of the indebtedness by the latter the tracts were re-conveyed to him; that in one instance he neglected to record a deed by which W. J. Patterson re-conveyed to him a tract of land, and this deed was after his death found among his papers and filed for record by B. W. Patterson; that after making the deed in November, 1889, he delivered a car-load of cattle to B. W. Patterson in payment of that portion of the mortgage indebtedness of $2750 which had been apportioned to the 78 acres in controversy; that William M. Patterson during his lifetime, and Margaret Patterson after his death, rented this land and collected and received the

rents therefrom; and that B. W. Patterson never made any claim of ownership to the land until after the death of his mother, but, on the contrary, made statements inconsistent with any such claim of ownership. From this evidence appellants deduce the theory that William M. Patterson had an aversion to signing notes and executing mortgages, and that when it became necessary to execute a new note and mortgage to take the place of the note and mortgage which had been given to the insurance company by Daniel M. Patterson on March 11, 1876, he caused his wife to convey this 78 acres, which stood in her name and was covered by the old mortgage, to B. W. Patterson, in order to avoid the necessity of himself and wife signing the new note and mortgage; that this was the sole and only purpose of the conveyance of the 78 acres to B. W. Patterson; that William M. Patterson afterwards paid that portion of the mortgage indebtedness which had been apportioned to this 78 acres by the delivery of the car-load of cattle to B. W. Patterson, and that the latter either re-conveyed the 78 acres to his father or mother by a deed which was never recorded and cannot now be found, or it thereupon became his duty to convey the same, and he thereafter only held the legal title as trustee for his mother, and is now holding it as trustee, to be disposed of according to the provisions of her will.

The evidence relied upon by appellants as proving the allegation of the bill that the deed from Margaret Patterson and husband to B. W. Patterson was executed "in connection with and as a part of a mortgage, and for no other purpose," and as proving their theory that this deed was given in order that a new mortgage might be given upon the same land without requiring the signatures of William M. Patterson and Margaret Patterson thereto, is that tending to show that after the execution and delivery of the deed and the giving of the new mortgage William M. Patterson paid that portion of the mortgage indebtedness

which had been originally apportioned to the 78 acres in controversy by delivering a car-load of cattle to B. W. Patterson, upon the understanding and agreement that the latter should apply the proceeds therefrom, when sold, to the payment of the mortgage indebtedness against this land. The evidence relied upon by appellants as proof of this fact is, however, incompetent, most of it consisting of alleged statements which witnesses for the complainants testified had been made to them by William M. Patterson during his lifetime, out of the presence of B. W. Patterson, and the remainder consisting of testimony given by Charley Patterson, a nephew of William M. Patterson, on rebuttal. This last witness, while called by the complainants in presenting their case in chief, did not then testify to any conversation with B. W. Patterson concerning the car-load of cattle, but when called in rebuttal testified, over the objections of the defendants, that he saw the cattle in question in the possession of B. W. Patterson, and that the latter told him, in 1892 or 1893, that he got them from his father; that he was to "feed them out" and apply the proceeds on the mortgage, and that the cattle just about "paid his father out of debt." The court heard this testimony subject to the objections of the defendants, and as it did not tend to rebut anything adduced by the defendants, it should have been, and undoubtedly was, disregarded by the court in determining the ownership of this land. Another witness, George W. Patterson, one of the complainants, testified to a conversation with B. W. Patterson concerning the delivery of a car-load of cattle to him by William M. Patterson. He testified that he saw the cattle on B. W. Patterson's farm, and that the latter told him that his father had turned them over to him in consideration of his agreement to pay the mortgage upon the 78 acres belonging to his father. This witness testified that he had this conversation with B. W. Patterson while the witness was living on the land given him by his father, and that

it occurred before he deeded that land to Blackwell. The
land was deeded to Blackwell in 1886,—three years be-
fore B. W. Patterson obtained title to the 78 acres and re-
mortgaged it to secure the same debt of $2750 which had
been a lien upon that land since 1876. B. W. Patterson
denied making the statements attributed to him by this wit-
ness. But even if the testimony of the witness be taken
as true, it does not tend to support the allegation of the
bill or appellants' theory of the transaction. Nor would
the fact that William M. Patterson had during the year
1886, or before that time, delivered to B. W. Patterson a
car-load of cattle in payment of that portion of the mort-
gage indebtedness against his land tend to show that a deed
made at least three years later, and purporting to con-
vey the same land to B. W. Patterson in consideration of
$2600, had any connection with the former transaction or
was anything other than an absolute conveyance of land.

The testimony tending to show that B. W. Patterson
had made statements inconsistent with his claim of owner-
ship to the land was successfully controverted, and the other
matters above mentioned which are relied upon by appel-
lants as tending to support their claim that Margaret Pat-
terson was at the time of her death the owner of this land,
are wholly insufficient to sustain their claim. Neither the
fact that William M. Patterson had theretofore conveyed
tracts of land to his sons W. J. Patterson and Daniel M.
Patterson in order to obtain loans without being required
to execute notes and mortgages therefor, nor the fact
that he had on one occasion neglected to record a deed re-
conveying land to him, nor the fact (if such be a fact)
that William M. Patterson and Margaret Patterson were
permitted to receive and enjoy the rents from the land
during their lifetime, nor the fact that the witnesses called
by the complainants had never heard of B. W. Patterson
asserting any claim of ownership to the land during the
lifetime of his mother, is necessarily inconsistent with the

theory that he purchased this land and that the deed which he received is what it purports to be. As we said in *Reeve* v. *Strawn,* 14 Ill. 94, and again in *Ryder* v. *Ryder,* 244 id. 297: "Before we transfer the title to real estate upon the strength of parol testimony alone, the facts upon which such change is asked should be so convincing as to leave no reasonable doubt in the mind of the court."

Appellants contend that the evidence shows that B. W. Patterson was, during the lifetime of his father and mother, in possession of this land as their tenant, and argue that, because of the well known rule that a tenant is estopped from denying his landlord's title, B. W. Patterson is now estopped from denying that Margaret Patterson was the owner of the land at the time of her death, and that they are entitled to a decree divesting B. W. Patterson of his title to the land and placing it in the heirs of Margaret Patterson in order that it may be sold and the proceeds distributed according to the provisions of her will, and that they are also entitled to an accounting of the rents and profits of that land from the time William J. Patterson was removed as agent for his mother. There is no evidence whatever in the record showing that B. W. Patterson was ever in possession of the 33-acre tract in section 36 as the tenant of his father or mother or that he ever paid any rent therefor. The only evidence concerning the renting of this tract is to the effect that in 1890 William M. Patterson rented it to a man named Righter, who occupied it as the tenant of William M. Patterson for six years, and that the tract was thereafter rented by William M. Patterson to a man named Simmons, who was in possession of it as tenant at the time of the death of William M. Patterson, and who for two or three years after his death paid the rent therefor to W. J. Patterson, as agent for his mother. There is also evidence tending to show that Margaret Patterson was permitted to enjoy the rents from this tract during the remainder of her life, but the evidence fails to

show who was in the actual possession of the tract during that time.

The remainder of the land in controversy is the south half of a 90-acre tract, and is referred to by a number of the witnesses as the East Nelson farm, it being in East Nelson township. The land which it is conceded Margaret Patterson owned at the time of her death consists of about 131 acres, composed of the north half of the 90-acre tract in East Nelson township, eight acres adjoining that tract in Sullivan township, and several small disconnected tracts, the exact location of which cannot be determined from this record. The evidence shows that B. W. Patterson farmed all of this land, as well as the land owned by him, during at least the last six years of his father's life and was farming it at the time of his father's death, but there is no competent evidence whatever which can be considered as proof of the fact that B. W. Patterson ever paid any rent to his father, or to his mother during the lifetime of his father, for the 45 acres in controversy in East Nelson township. The only period during which any payment of rent by B. W. Patterson for this 45 acres is shown by any competent evidence is the period during which W. J. Patterson acted as agent for his mother. W. J. Patterson testified that when he and his brother Daniel M. Patterson became agents for their mother, in February, 1897, they rented the 90-acre tract in East Nelson township, together with all the other land owned by their mother except the 33 acres in section 36, to B. W. Patterson, and the latter paid annual rent therefor at the rate of four dollars per acre, except for 60 acres of pasture land, for which he paid $150; that Daniel M. Patterson prepared a memorandum of the rental agreement and gave it to the witness to copy; that he copied this memorandum and had B. W. Patterson sign it, but does not know what has become of the one which was signed. The witness produced a paper which he testified was the memorandum prepared by Daniel M. Pat-

terson; that it correctly set forth the agreement which was made with B. W. Patterson for the leasing of the land to him, and that it had been in the possession of the witness ever since. This memorandum, which was not signed by anyone, purported to be a recital by B. W. Patterson that he had rented from D. M. Patterson and W. J. Patterson, agents of Margaret Patterson, for one year, with the privilege of three years, her farm situated in East Nelson township, 90⅛ acres, and 18½ acres in Sullivan township; also her pasture, 60 acres, in Sullivan township; for which he agreed to pay one-half of all corn raised on the place and one-third of all small grain and $150 for the 60 acres of pasture, and also to furnish all necessary things for the family to live on and to pay a girl for her work. W. J. Patterson testified that shortly after this agreement was made the grain rent was changed to cash rent at the rate of four dollars per acre. The evidence, however, clearly shows that B. W. Patterson never paid any rent to W. J. Patterson but settled directly with his mother during these years and paid her the balance found due upon an accounting between them, which did not during any of these years exceed $150.

During the fall of 1899 Margaret Patterson called upon W. J. Patterson for a settlement of his accounts as agent from the time of his appointment, in 1897, this settlement apparently being of moneys collected from notes and accounts due William M. Patterson at the time of his death, after deducting the amount paid out for debts and funeral expenses. During the month of December, 1899, W. J. Patterson and B. W. Patterson met with their mother at her home for the purpose of making the settlement. At the request of the former, his cousin, Charley Patterson, and Charles Tabor, a neighbor, were present at the settlement. W. J. Patterson testified that he requested these parties to be present in order that he might have witnesses to the settlement with his mother and witnesses to the receipt which he expected to have his mother sign. As a re-

sult of this settlement Margaret Patterson signed, by mark, a document which was witnessed by Charley Patterson and Charles Tabor, in which it was stated that it had been determined, upon a settlement then made of the accounts of W. J. Patterson as agent, that W. J. Patterson was indebted to his mother in the sum of $76.02. Neither Charley Patterson nor Charles Tabor had any recollection whatever concerning this receipt nor of signing it as witnesses, but both testified that at the time of this settlement the fact that B. W. Patterson was paying rent at the rate of four dollars per acre on the 90 acres in East Nelson township was mentioned. The memory of these witnesses about what took place and what was said at the time of that settlement is so indistinct and so unreliable that a court would not be justified in finding therefrom that B. W. Patterson, who held the record title to the south 45 acres of the 90-acre tract which the witnesses say was mentioned at the time of that settlement, was renting that 45 acres from his mother and paying rent therefor as her tenant. At times these witnesses referred to the 90-acre tract as the 90 acres in East Nelson township and at other times as the East Nelson farm. It is very probable that if at the settlement the fact was mentioned that B. W. Patterson was paying rent at the rate of four dollars per acre for the East Nelson farm or the land in East Nelson township the witnesses would conclude therefrom that he was paying rent for the entire 90 acres in East Nelson township at that rate, when, as a matter of fact, the conversation may have related only to that portion of the land in East Nelson township owned by Margaret Patterson and the number of acres for which he was paying rent may not have been mentioned.

Shortly after this settlement with his mother and the revocation of his authority to act as her agent W. J. Patterson sent to some of the children and grandchildren of Margaret Patterson letters which purport to contain a statement of the income and expenses of the land owned by

his mother for the years 1897 and 1898. He gave the income from all the land (exclusive of the 33 acres in section 36) for those two years as being $858.25, or an average of $429.12 for each year, and the expenses for the same period as $802.27. This statement, made by W. J. Patterson in December, 1899, completely refutes his testimony, given ten years later, that B. W. Patterson rented the 45 acres in controversy from him and his brother Daniel M. Patterson, that the purported memorandum correctly sets forth the terms of the rental agreement, and that B. W. Patterson paid rent upon that 45 acres during the time that W. J. Patterson acted as agent for his mother. According to the testimony of W. J. Patterson the ultimate agreement was that B. W. Patterson should pay $150 per year for the pasture and four dollars per acre for the balance of the land, consisting of 108 acres. Upon such terms the annual income from the land mentioned in the memorandum would have been $582 instead of $429.12, as shown by the statement. The amount shown by the statement to be the yearly income from the farm is approximately the amount which would have been received from the 131 acres of land owned by Margaret Patterson upon the terms testified to by W. J. Patterson, the difference being less than five dollars. The only other evidence concerning the renting of this tract by B. W. Patterson introduced by the complainants is the testimony of Perry Patterson, a nephew of William M. Patterson, who testified that he thinks B. W. Patterson told him upon several occasions that he had rented the 90 acres in East Nelson township and the pasture land, and that he paid grain rent for a short time and afterwards four dollars per acre. This witness could not fix the time when he had these alleged conversations with B. W. Patterson, and it is apparent from reading his testimony that his memory about the conversations was equally as unreliable as that of the witnesses Charley Patterson and Charles Tabor concerning

the conversation which occurred at the time of the settlement between W. J. Patterson and his mother. B. W. Patterson denied making any such statements as were attributed to him by the witness Perry Patterson. The only documentary proof relating to the renting of land by B. W. Patterson is the lease or contract which was executed by him and his mother on February 27, 1907, and this instrument did not mention either the 33-acre tract or the 45 acres in East Nelson township.

It is our conclusion, from a careful consideration of all the evidence bearing upon the question, that it is not shown by any reliable evidence or with a sufficient degree of certainty that B. W. Patterson ever occupied the 45 acres in question as the tenant of either his father or mother. It is therefore unnecessary to consider whether the doctrine that a tenant is estopped from denying his landlord's title can be invoked in a proceeding brought against the tenant for the purpose of divesting him of his title and vesting it in the heirs or devisees of the landlord. The finding contained in the decree that B. W. Patterson is the owner of the 78 acres of land in controversy is supported by the proof and is not contrary to the weight of the evidence, and as this was one of the issues in the case there was no impropriety in making the findings upon this issue which are contained in the decree, even though the effect of such findings may be, as appellants contend, to confirm the title in B. W. Patterson. It necessarily follows that the complainants were not entitled to an accounting from B. W. Patterson for the rents and profits from the 78 acres in question.

Appellants complain of the action of the court in refusing to make any finding with reference to the merits of the claims filed by B. W. Patterson against the estate of Margaret Patterson, and, in effect, remitting the parties to their remedy at law, and Margaret Underwood, under her assignment of cross-errors, complains of the disposition of

her claim made by the decree. As we have hereinbefore stated, the apparent relief sought by the bill with reference to these claims was to obtain an injunction restraining their prosecution at law and a decree ordering the contract and notes to be delivered up and canceled. In order to obtain this relief, under the issues of this case, it was incumbent upon the complainants to show that they had a defense which was only cognizable in a court of equity. (*Catholic Bishop of Chicago* v. *Chiniquy,* 74 Ill. 317; *County of Cook* v. *City of Chicago,* 158 id. 524.) This they claim to have done, with reference to the claims of B. W. Patterson, by proving that a confidential relation existed between B. W. Patterson and his mother, and that after the second stroke of paralysis, in 1900, Margaret Patterson became mentally and physically incapable of transacting business, and argue that from these facts a court of equity will presume that the contract and notes which form the basis for the claims filed by B. W. Patterson were procured by undue influence exercised by him and are therefore fraudulent and void. In other words, their contention is, that having shown that a confidential relation existed between B. W. Patterson and his mother, and that the latter, on account of her weakened condition, was susceptible to the influence of the former, the law imposed on B. W. Patterson the burden of showing, by clear and convincing proof, that the contract was equitable, fair and just and that the notes were based upon an adequate and sufficient consideration, which appellants contend he failed to do. The evidence fails to show that B. W. Patterson abused this confidence or obtained any advantage in any of the transactions with his mother, but, on the contrary, shows, as clearly as can reasonably be expected, that the contract of February 27, 1907, was just and equitable, and that the notes were given upon a fair settlement of accounts and represented the amounts equitably and legally due B. W. Patterson from his mother at the times they were given.

By the contract in question Margaret Patterson leased her land to B. W. Patterson at an annual rental of $350, and in the settlements which resulted in the giving of notes on March 3, 1908, and March 2, 1909, he was charged with that amount for rent due his mother, and appellants contend that this was a grossly inadequate rental. It is true that one witness called by appellants testified that the reasonable rental value of the 209 acres of land which appellants claim Margaret Patterson owned at the time of her death had been during the past ten years $1100 per annum, but the witness did not designate what portion of that amount was the rental value of the 78 acres which B. W. Patterson owned nor what portion was the rental value of the remaining 131 acres which Margaret Patterson owned. Another witness testified that the rental value of the 90-acre tract in East Nelson township, which includes the 45 acres owned by B. W. Patterson, was four or five dollars per acre from 1899 to 1905 and seven dollars per acre from 1905 to the present time. The witness did not, however, testify that such was the rental value of the north 45 acres which belonged to Margaret Patterson, nor can the rental value of the remaining land owned by Margaret Patterson be determined from his testimony. Still another witness testified that the annual rental value of the 90-acre tract, which includes the 45 acres owned by B. W. Patterson, had been six dollars per acre for the past seven years and that for the three years preceding that period was five dollars per acre. The same objection appears to the testimony of this witness as to the testimony of the former witness. It is apparent that the testimony given by these witnesses was of no benefit whatever in determining the rental value of the 131 acres owned by Margaret Patterson during the last ten years of her life or at any time during that period. On the other hand, while there is no direct evidence of the rental value of this land, it does appear from letters written by William J. Patterson

251—12

to some of the children and descendants of Margaret Patterson in December, 1899, that the reason his mother revoked his agency was because she desired to accept the offer of $325 per year as rent for her land made by B. W. Patterson, while he (W. J. Patterson) was insisting on renting it to a stranger who had offered to pay more rent for it. It therefore appears that before Margaret Patterson had sustained the stroke of paralysis which left her a helpless invalid, and at a time when her mental faculties were unimpaired by the disease from which she afterwards suffered, and when she had the independent advice of another son who was then acting as her agent, she insisted upon renting her land to B. W. Patterson for $325 per year, being apparently a little less than the amount received as rent during the preceding two or three years, notwithstanding the fact that a stranger was willing to pay more rent. Nor was this action on her part unreasonable or against her interests. She was an old woman and was personally unable to manage her farm. As long as she rented it to B. W. Patterson, however, she could live in her own home and receive the care and attention which at her age she required, from one of her own children instead of entrusting herself to the care of strangers, as she might have been compelled to do had the land been rented to another. While the annual rent with which B. W. Patterson was charged in the settlement with his mother which resulted in the giving of the $6550 note on February 28, 1907, is not shown, yet it is fair to assume that the amount ranged from $325 to $350 per year. In the absence of any testimony showing that this was an inadequate rental for the land, and in view of the attitude taken by Margaret Patterson before any confidential relation existed between her and B. W. Patterson and at a time when she had independent advice, and in view of the benefit which would naturally accrue to her from being able to live in her own home with her own son, there can be no presumption in this case that

B. W. Patterson exercised undue influence in renting the land from her at an annual rental of from $325 to $350.

· The defendant B. W. Patterson introduced considerable evidence showing various amounts paid out by him from 1899 to the time of his mother's death for the services of nurses, physicians and servant girls, for medicines, groceries, meat, taxes, repairs, and various other expenses incurred in caring for his mother, in maintaining the household and in making repairs on the farm. It is unnecessary to attempt to give these various items in detail or to determine the total amount shown to have been paid out, which is stated in appellees' argument to have been between $10,000 and $11,000, but it is apparent from the fact that the amount paid for nurses and servant girls alone during the latter years amounted to $12 per week, that an agreement to pay $25 per week in consideration that B. W. Patterson should pay all expenses incurred in taking care of his mother and in conducting the household was not unreasonable. The children of Margaret Patterson, some of whom resided in foreign States, and members of their families, as well as other relatives and friends, frequently visited her during the years of her illness, sometimes staying for periods of several weeks. It is not shown that any of them, except Margaret Underwood, assisted materially in caring for Mrs. Patterson, but their visits necessarily increased the household expenses, which were borne by B. W. Patterson. The evidence does not show the various items entering into the settlement which resulted in the giving of the $6550 note, but it does appear that the settlement was made from an account book kept by B. W. Patterson showing the various items paid out by him during several years preceding that settlement. It therefore does not appear that B. W. Patterson obtained any advantage over his mother in this settlement, but, on the contrary, using the settlements made in 1908 and 1909 under the contract as a criterion, it would appear that B. W. Patterson received something less per

year on account of expenses paid by him during the period from December, 1899, to February, 1907, than he received during the subsequent years under the contract. This is perhaps, in part, accounted for by the fact that during a portion of this period the nurses were paid but seven dollars per week and servant girls but two dollars per week.

That Margaret Patterson received the best of care and attention during all the years of her sickness is a fact which appellants do not deny, and in our judgment the record shows, with as great a degree of certainty as can reasonably be expected, that she received full value for the notes given to B. W. Patterson, and that he derived no advantage in the transactions and did not abuse the confidence reposed in him by his mother.

Considerable evidence was introduced concerning the mental condition of Margaret Patterson from the time she received the second stroke of paralysis until her death. While this evidence shows that her mental faculties were somewhat impaired, yet on the whole what we consider the most credible evidence shows that she was able to understand and comprehend the ordinary business affairs of life, and in particular that she understood the nature and effect of the transactions when she executed the contract and notes in question.

The proof fails to establish any equitable defense to the claims of B. W. Patterson.

The appellants contend that the court erred in refusing to take over the administration of the estate of Margaret Patterson, to remove B. W. Patterson as executor and to appoint some disinterested person to administer upon the estate and carry out the provisions of the will. A court of equity will not exercise this jurisdiction and take upon itself the administration of an estate except in extraordinary cases, where some special reasons are shown to exist why the administration should be withdrawn from the probate court. (*Freeland* v. *Dazey,* 25 Ill. 294; *Shepard* v.

*Speer,* 140 id. 238; *Ames* v. *Ames,* 148 id. 321; *Goodman* v. *Kopperl,* 169 id. 136; *Elting* v. *First Nat. Bank,* 173 id. 368.) Appellants have not made out such a case. They can obtain all the relief to which they may be entitled with reference to all of the matters alleged as grounds for interference by a court of equity, in the probate court.

It is also urged that the court erred in refusing to order an accounting by B. W. Patterson of the rents and profits received by him from the land owned by his mother at the time of her death. B. W. Patterson had accounted to his mother for the rents up to March 1, 1909, and settlements had been had between them, as hereinbefore shown, by which all rents due from him were paid. Under the contract with his mother he was entitled to retain possession and use of the lands until the first day of March, 1910, at a rental of $350, which he has credited upon one of the notes filed by him against his mother's estate. The record therefore fails to show that B. W. Patterson is liable for any rents and profits for which he is under any obligation to account to the complainants.

Appellants contend that the court should have passed upon the merits of the B. W. Patterson claims and should have disallowed them because of the legal defenses which they claim to have established thereto, even though they failed to establish the equitable defense set up in their bill, and they seek to have the decree reversed with directions to the circuit court to disallow those claims. The appellee B. W. Patterson, in reply to this contention, urges, first, that the provision in the decree relating to these claims is authorized by section 40 of the Chancery act, which provides that the court may, in its discretion, direct an issue or issues to be tried by a jury whenever it shall be judged necessary in any cause in equity pending therein, and that the action of the court in exercising its discretion under the authority conferred by this section is not subject to review; and second, that the court having found that all of the

alleged defenses to these claims could be interposed · in a court of law, its action in remitting the parties to the court of law was proper and the decree therefore not erroneous in that regard. Margaret Underwood, under her assignment of cross-errors, complains of the action of the court in sustaining the objections of the complainants to her claim, in denying judgment thereon and in awarding costs against her, and insists that this disposition of her claim was contrary to the law and the evidence and that the court should have allowed her claim against the estate; while appellants contend that as Margaret Underwood was the daughter of Margaret Patterson, the services rendered by her for her mother are presumed to have been gratuitous, in the absence of proof of any contract between the parties showing that Margaret Patterson agreed to pay for such services, and that the note was therefore only an attempted gift, which cannot be enforced against the estate of Margaret Patterson; that it also appeared that the note was never delivered to Margaret Underwood during the lifetime of her mother, and that for these reasons the court properly disallowed the claim. These alleged defenses to the claims of B. W. Patterson and Margaret Underwood can be interposed in a court of law, and the court having correctly decided that the equitable defenses relied upon by appellants had not been established, did not err in refusing to pass upon the legal defenses to the claims of B. W. Patterson or in remitting the parties to their remedy at law. Where the bill seeks equitable relief and the evidence establishes the right to that relief, the court will retain jurisdiction for all purposes connected with the subject matter of the suit and establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority; (*Stickney* v. *Goudy,* 132 Ill. 213;) but where the bill is dismissed as to the portion founded on the right to equitable relief and only legal rights remain to be ascertained and passed upon, the jurisdiction of the court must

fail unless some equitable ground appears for retaining jurisdiction. *Daniel* v. *Green,* 42 Ill. 472; *Toledo, St. Louis and New Orleans Railroad Co.* v. *Railroad Co.* 208 id. 623.

As heretofore pointed out in this opinion, the decree dismissed the bill for want of equity, thus disposing of all the issues arising upon the pleadings in the case, including the alleged equitable defenses to these claims, adversely to the complainants. The decree contained a recital, however, to the effect that the parties had agreed that the court might hear the proof applicable to the merits of these claims, but it was also expressly stated in the decree that the claims are pending on the common law docket of the court and are not consolidated with the chancery suit. No agreement or stipulation of any kind between the parties appears in the record, except as shown by the recital just mentioned in the decree. If it was the intention of the parties to submit these claims to the court of equity for decision upon the evidence heard in the chancery suit, the suits thereon should have been transferred from the law side to the chancery side of the court and consolidated with the chancery suit, otherwise the jurisdiction of the court of equity to grant relief was necessarily limited to the issuance of an injunction restraining the prosecution of these claims in the court of law, and the court was without jurisdiction of the subject matter to allow these claims against the estate of Margaret Patterson or to require their allowance by the court of law. The only conclusion which can be drawn from the provisions of the decree with reference to the claims of B. W. Patterson is, that the court has refused to interfere with the proceedings at law upon those claims, and that the suits thereon are now pending for trial upon the common law docket of the court in the same manner as though this chancery suit had never been brought, and that the court has therefore remitted the parties to their remedy at law. While the decree recites that the court desires the benefit of the advisory aid of the verdict of a jury upon

these claims it does not direct any issue or issues to be tried by a jury, nor does the court by the decree retain any jurisdiction of the cause for the purpose of entering any subsequent decree therein after the verdict of a jury has been rendered. This provision with reference to the desire of the court to have the benefit of the advisory aid of the verdict of a jury should not have been inserted in the decree, as it can serve no purpose but to confuse the parties and the court in the proceedings at law upon those claims.

With reference to the claim of Margaret Underwood, the court, instead of remitting the parties to their remedy at law, as in the case of the claims of B. W. Patterson, has attempted to finally dispose of her claim, not by enjoining the prosecution of the suit at law, but by finding that the complainants have a legal defense to the claim by denying judgment thereon and by awarding costs against Margaret Underwood. The claim was not before the court of equity in such form as to give it jurisdiction either to render judgment or to deny judgment thereon, but the only relief which it had any jurisdiction to grant was an injunction restraining the prosecution of the suit at law. This relief was, however, denied by the action of the court in dismissing the bill for want of equity. Although the parties have not raised the question of jurisdiction in this court but have discussed the law and the evidence applicable to this claim, the lack of jurisdiction in the circuit court to enter a decree allowing the claim against the estate of Margaret Patterson in case we should conclude, from the evidence in this record, that the complainants have no legal defense to the claim and should remand the cause to the circuit court with directions, requires us to refrain from considering any of the questions discussed by the parties with reference to the alleged legal defenses to the claim and to modify the decree so as to permit the prosecution of the claim at law, where Margaret Underwood can obtain a judgment against the estate of Margaret Patterson if the

law and evidence shall warrant such judgment. Nothing said in this opinion is intended to, or should, prejudice the rights, if any, of the parties upon trials of these claims at law.

The decree will be modified by striking out all findings with reference to the claims of B. W. Patterson and Margaret Underwood, except the finding that the complainants have a full, adequate and complete remedy at law, and also by striking out the following portion of the decree: "It is further ordered, adjudged and decreed by the court that the objections of the complainants herein to the claim of Margaret Underwood against the estate of Margaret Patterson, deceased, be and the same are hereby sustained and judgment upon said claim is hereby denied. And it is further ordered, adjudged and decreed by the court that the complainants herein have and recover of and from the defendant Margaret Underwood all their costs by them in this behalf made in relation to the claim of the said Margaret Underwood against the estate of Margaret Patterson, deceased, and that they have execution therefor." As so modified the decree will be affirmed.

*Decree affirmed as modified.*