DALE GORDON et al., Plaintiffs-Appellees, v. DONALD W. BAUER et al., Defendants and Third–Party Plaintiffs-Appellants (C.W. Schafer, d/b/a Schafer Real Estate, Third–Party Defendant-Appellee).

Fifth District   No. 5—86—0619

Opinion filed November 23, 1988.—Rehearing denied December 30, 1988.

1074

Donald W. Bauer and Lauretta Bauer, of Altamont, appellants *pro se.*

William W. Austin and Todd E. Schum, both of Parker, Siemer, Austin, Resch & Resch, of Effingham, for appellees Dale L. Gordon and Ethel I. Gordon.

Lou J. Viverito, of Taylor, Wolff, Burkey & Eder, P.C., of Effingham, for appellee C.W. Schafer.

JUSTICE CALVO delivered the opinion of the court:

Defendants, Donald W. Bauer and Lauretta Bauer, farmers, entered into a real estate listing agreement with third-party defendant C. W. Schafer, a licensed real estate broker doing business as Schafer Real Estate (Schafer), to sell two pieces of farmland owned by the Bauers. Plaintiffs, Dale L. Gordon and Ethel I. Gordon, also farmers, subsequently entered into two contracts with the Bauers to buy both tracts of land. The parties scheduled closing for April 30, 1983, but they never consummated the transaction. The Gordons initiated suit against the Bauers for specific performance and damages after the Bauers informed the Gordons that they did not intend to close. The Bauers filed a third-party complaint seeking damages against Schafer alleging, among other things, breach of fiduciary duty. Schafer counterclaimed against the Bauers for his brokerage commission. After nine days of a 19-day bench trial, the Gordons moved to dismiss that part of their complaint seeking specific performance and elected to pursue only their damage claims. The trial court allowed the motion, subsequently found in favor of the Gordons and awarded them damages in the amount of $19,972.23. The trial court also found in favor of Schafer and awarded him $10,500. The Bauers appeal *pro se* and present 13 issues for review. For efficiency, we will address these issues in a somewhat different order than raised by the Bauers in their brief.

The first five issues revolve around the trial court's decision to allow the Gordons to continue the trial in equity on the damage claims after they voluntarily dismissed the specific performance claims. The Gordons initially filed a three-count complaint. They later amended their complaint to include a fourth count. Counts I and II prayed for specific performance of the two contracts to sell the two pieces of real estate. In counts III and IV, the Gordons restated their allegations set forth in counts I and II and prayed in equity for various damages they incurred as a result of the Bauers' failure to perform. In the middle of trial, the Gordons moved to dismiss counts I and II of their complaint. The trial court granted the dismissal, and further allowed the Gordons to proceed with the trial in equity on counts III and IV, the damage claims.

The Gordons alleged in count III that they incurred substantial penalties for the Bauers' failure to comply with the payment-in-kind (PIK) program administered through the Shelby County Agriculture Stabilization and Conservation Service (ASCS) by the United States Department of Agriculture. They also alleged that the Bauers' refusal to close the transactions caused a delay in the farming of the two

pieces of real estate. The Gordons then prayed for $25,000 in damages which included attorney fees.

The Gordons alleged in count IV that in order to purchase the real estate in question, they secured a commitment for a loan from the John Hancock Mutual Life Insurance Company (John Hancock). As part of that commitment, the Gordons paid a nonrefundable $2,250 to John Hancock which they lost as a result of the Bauers' failure to close the transaction. Thus, the Gordons prayed for $2,250 in damages.

In their motion to dismiss counts I and II, the Gordons alleged that due to the dramatic decline in the value of farm real estate during the two years between the execution of the contracts and the trial, the market value of the real estate at the time of trial was substantially lower than the contract price of the property; thus, specific performance was no longer a viable remedy for them. The Gordons attached to their motion the affidavit of plaintiff, Dale Gordon, a farmer for approximately 15 years, who attested to the dramatic decline in farm real estate in general and to the decline in value of the two pieces of real estate which were the subjects of the contracts.

At the close of trial, the Gordons, with the trial court's approval, amended counts III and IV of their complaint to conform to the proofs. The Gordons alleged in their amendments that the Bauers had agreed to sell them the wheat crop growing on the real estate at the time of the sale and that the Bauers retained, harvested and sold the wheat crop. The Gordons alleged that their damages included not only the loss of the wheat crop, but also attorney fees in the amount of $15,000, the loss of benefits under the PIK program and the loss of a diversion payment under the basic program (a farm program, similar to the PIK program, also administered by the ASCS).

In awarding judgment for the Gordons, the trial court found that the contracts were enforceable, that the Gordons were ready, willing and able to close the transactions on April 30, 1983, and that the Bauers breached the contracts. The court then awarded the Gordons the following damages: $2,250 for the deposit to John Hancock, $712.50 for the title insurance commitment fee, $1,453.69 for the penalty assessed by the ASCS for violation of the PIK program, $1,596.75 in lost diversion payments under the basic program, $8,921.50 in lost PIK benefits, $3,606.45 in net interest incurred on the sum borrowed to finance the purchases after the Gordons mitigated the damages by earning interest on said sum while holding it a reasonable time in an effort to effectuate a closing, and $1,431.34 representing the difference between the contract price and the actual

sale price obtained for the wheat harvest.

The Bauers initially allege that after the trial court allowed the Gordons to dismiss the specific performance counts of the complaint, the court was then without subject matter jurisdiction to hear the remaining damage claims. The Bauers point out that the Gordons' complaint alleged an action in equity because the specific performance counts were equitable remedies. They also rightly contend that the Gordons pled the damage counts as actions in equity, as *incidental* relief to the specific performance remedies. The Gordons did not plead the damage claims as actions at law for breach of contract, as *alternative* relief to the specific performance remedies.

The Bauers point to case law which holds that

> "[w]here the [complaint] seeks equitable relief and the evidence establishes the right to that relief, the court will retain jurisdiction for all purposes connected with the subject matter of the suit and establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority [citation] but where the [complaint] is dismissed as to the portion founded on the right to equitable relief and only legal rights remain to be ascertained and passed upon, the jurisdiction of the court must fail unless some equitable ground appears for retaining jurisdiction. [Citations.]" (*Patterson v. Patterson* (1911), 251 Ill. 153, 182-83, 95 N.E. 1051, 1063.)

(See *Alter v. Moellenkamp* (1961), 23 Ill. 2d 506, 511, 179 N.E.2d 4, 6-7; *Turek v. Mahoney* (1950), 407 Ill. 476, 483, 95 N.E.2d 330, 334; *Yonan v. Oak Park Federal Savings & Loan Association* (1975), 27 Ill. App. 3d 967, 976, 326 N.E.2d 773, 780; *Illinois Minerals Co. v. Miller* (1946), 327 Ill. App. 596, 604, 65 N.E.2d 44, 47.) Moreover, the Bauers point to authority which holds that "the withdrawal of a pleading removes it from consideration, and leaves the issues in the same status as though the withdrawn pleading had never been filed." (*Blazina v. Blazina* (1976), 42 Ill. App. 3d 159, 164, 356 N.E.2d 164, 168.) The Bauers, therefore, contend that because the damage claims were incidental to or based on the specific performance claims, and because the Gordons dismissed the specific performance claims, the court, under its equity jurisdiction, had no authority to award the incidental relief. The Bauers then argue that the court *in effect* awarded legal damages because it did not have jurisdiction to grant equitable damages. The Bauers assert that the court could not award damages at law because the Gordons did not pray for damages at law. The Bauers argue that the only way the Gordons could have obtained relief was to file a separate action at law for damages.

The trial court ruled that the damage claims were equitable claims. The court pointed out that if it found in favor of the Gordons at the close of trial, it could award not only specific performance of the contracts, but also the damages asserted in counts III and IV as well. The court noted that the damages pled would only make the Gordons whole; that awarding both specific performance and damages would not give the Gordons double recovery. The trial court then held that because the damages were equitable, it had the authority, as a court of equity, to hear the case and grant or deny the damages. The Bauers insist that although the damages were originally pled as equitable relief, the court *actually* awarded legal damages because it lost jurisdiction *in equity* to award damages when it dismissed the specific performance claims which provided the basis for the equitable damages.

■■ ■ We agree with the holding of the trial court, however, that it had jurisdiction in equity to award the damages and that the damages constituted equitable relief *even after* the court dismissed the specific performance counts. In an action for the breach of a contract for the sale of land, the injured party can sue for specific performance or for damages for breach of contract. (*Arnold v. Leahy Home Building Co.* (1981), 95 Ill. App. 3d 501, 509, 420 N.E.2d 699, 705.) If a party sues for specific performance, however, that party can also seek, and the equity court may award, other relief, including monetary damages, that will make the party whole. (*Arnold*, 95 Ill. App. 3d at 509, 420 N.E.2d at 705.) The court in *Rotogravure Service, Inc. v. R.W. Borrowdale Co.* (1979), 77 Ill. App. 3d 518, 527, 395 N.E.2d 1143, 1150, noted:

> "Our circuit courts have 'original jurisdiction of all justiciable matters ***.' (Ill. Const. 1970, art. VI, §9.) Therefore, the trial court hearing [equitable] matters has full jurisdiction to award such legal damages as have resulted from delay in the performance of the contract in addition to decreeing specific performance."

The *Arnold* court pointed out that

> "[a]lthough such compensation is often referred to by the courts as 'damages,' some authorities suggest that it should more properly be considered as equitable compensation in the nature of an accounting between the parties rather than legal damages, inasmuch as the court in awarding specific performance is confirming the contract and erasing the breach. [Citation.] Under this view, the compensation awarded as incident to a decree for specific performance is not for breach of contract

and is therefore not legal damages." (*Arnold*, 95 Ill. App. 3d at 509, 420 N.E.2d at 705.)

The type of damages prayed for by the Gordons constituted relief which, when combined with specific performance, would make the Gordons whole. The Gordons' voluntary dismissal of the specific performance claims did not alter the character of the damages.

*Patterson, Turek* and *Illinois Minerals*, which the Bauers cite for support, hold that although a court in equity may award damages in order to afford complete relief to the injured party, the court's jurisdiction to hear the damage claims will fail if the claim for equitable relief fails. (*Patterson*, 251 Ill. at 182-83, 95 N.E. at 1063; *Turek*, 407 Ill. at 483, 95 N.E.2d at 334; *Illinois Minerals*, 327 Ill. App. at 604, 65 N.E.2d at 47.) In *Patterson* and *Turek*, however, the courts expressly found that the plaintiffs did not prove the elements necessary for them to be awarded relief in equity. (*Patterson*, 251 Ill. at 163, 182-83, 95 N.E. at 1056, 1063; *Turek*, 407 Ill. at 480, 483, 95 N.E.2d at 332, 334.) In *Illinois Minerals*, plaintiffs filed suit seeking an injunction, damages in equity and damages at law. The appellate court remanded the case and held that if the trial court decided that an injunction should issue, only then would the court have the right to adjudicate the damage issues. (*Illinois Minerals*, 327 Ill. App. at 606, 65 N.E.2d at 48.) In the case at bar, the trial court did not find that the Gordons failed to prove that they were entitled to specific performance. We do not agree with the Bauers' assertion that it does not matter that the court made no finding regarding the specific performance claims. By voluntarily dismissing their specific performance claims, the Gordons only stated that they did not want that part of the award to which they would otherwise be entitled (assuming they proved all of the elements necessary to be awarded specific performance).

The trial court properly relied on *Geist v. Lehmann* (1974), 19 Ill. App. 3d 557, 312 N.E.2d 42. In that case, Geist entered into a contract to purchase real estate from Lehmann. Geist did not close the transaction, but instead sued Lehman for rescission of the contract based on a mistake regarding the boundaries of the property. Lehmann filed suit for specific performance of the contract and the court consolidated the suits. Between the time Geist filed the complaint and the commencement of the trial, two fires damaged the property. Geist subsequently amended his complaint and prayed for rescission based on destruction of the premises; he then moved for summary judgment. The trial court denied Geist's motion for summary judgment and allowed Lehmann to elect forfeiture of the ear-

nest money rather than specific performance of the contract. The appellate court addressed the issue of what remedies were available to Lehmann when Geist delayed the closing and the property was materially damaged after the date originally set for closing. The appellate court held that while Lehmann could elect forfeiture of the earnest money, he was not entitled to specific performance of the contract. The court stated that "[i]t has long been recognized that when events subsequent to the execution of a contract produce a change of circumstances of such a nature as to cause a peculiar hardship or an inequitable result, a court of equity will refuse to grant specific performance." *Geist*, 19 Ill. App. 3d at 561, 312 N.E.2d at 46; see *Moehling v. Pierce* (1954), 3 Ill. 2d 418, 424, 121 N.E.2d 735, 738 (in equity, the rights of the parties are determined at the time the judgment is entered, not at the inception of the litigation); *Pritchard v. Wilcox* (1942), 314 Ill. App. 132, 138, 40 N.E.2d 831, 833-34 (equity court may provide monetary relief where vendor's conveyance of the property to a third party after commencement of the litigation rendered specific performance of the contract impossible).

The Bauers correctly point out that when the court in *Geist* put the risk of loss on the seller, it relied on language in the parties' contract which made the contract voidable at the option of the purchaser, if the property was materially damaged prior to closing. (*Geist*, 19 Ill. App. 3d at 561-62, 312 N.E.2d at 46.) The Bauers thus assert that the contract provision in *Geist* prevented Lehmann from receiving specific performance. The contracts between the Bauers and the Gordons contained no such provision which would prevent the Gordons from receiving specific performance. Nevertheless, when a contract is silent regarding the remedies available when a change of circumstances arises after execution of the contract, a court of equity can still refuse to grant specific performance, provided that the change of circumstances would result in a peculiar hardship on the injured party or would produce an inequitable result if the court granted specific performance.

*Lenti v. Colomb* (1966), 74 Ill. App. 2d 94, 220 N.E.2d 65, is similar. In *Lenti*, plaintiffs agreed to sell their business to defendant. Defendant failed to make payments under the contract and plaintiffs filed a complaint in chancery (equity) for specific performance in 1959. Sometime in 1960, defendant sold the business to a third party. The master in chancery, after a hearing, recommended that the trial court enter judgment against defendant for $17,500. Defendant filed objections to the master's report alleging that the case be transferred to the law side of the court because plaintiffs' remedy at law was ade-

quate, thus precluding any relief in equity. The case was dismissed from the equity side of the court and transferred to the law side pursuant to defendant's objections. The appellate court held that the trial court was incorrect in transferring the case. The court noted:

"At the time the plaintiffs filed their suit in equity for specific performance, the defendant had not yet disposed of the property ***. The suit, seeking in part that the defendant be required to execute the confession of judgment note and the chattel mortgage specified in the contract, was therefore properly brought in equity, and the equity court properly assumed jurisdiction over it. The trial court's recognition of the appropriateness of the suit for specific performance is evidenced by its original denial of defendant's motion to dismiss on grounds that the plaintiffs' remedy at law was adequate. Events occurring after the suit was filed, none of which was attributable to the plaintiffs, rendered specific performance no longer an appropriate remedy. Under these circumstances, we think the court of equity should have retained the case for consideration of plaintiffs' claim for damages. The parties were put to a lengthy and expensive hearing before a Master in Chancery, at which all of the factual and legal issues were litigated. It would seem grossly unfair as well as unnecessary to require them to begin again in a court of law.

*** [T]he suit was properly brought in equity, and it was only the change of conditions after the filing of the suit which made the equitable remedy of specific performance inappropriate."

*Lenti*, 74 Ill. App. 2d at 97-98, 220 N.E.2d at 67.

The Gordons submitted the affidavit of Dale Gordon, who attested that the two tracts of farm real estate which were the subjects of the contracts had declined in value between 1983, when the contracts were signed, and 1985, when the trial took place. Thus, the market value of the property at the time of trial was much less than the contract price of the property. Specific performance of the contract, therefore, would impose an inequitable result on the Gordons. The Bauers argue that neither Dale Gordon nor any other witness ever testified to the decline in value of the property and the affidavit was improper evidence. Thus, according to the Bauers, the Gordons did not have any support for their allegation that the property declined in value.

█ The record reflects that the Bauers did not object to the affidavit during the trial court's consideration of the motion to dismiss. The record does reveal that the Bauers filed a motion to strike por-

tions of the Gordons' amended complaint, including the affidavit. The Bauers admit, and our review of the record confirms, however, that the motion was not considered or ruled upon by the trial court. The party filing the motion has the responsibility to bring it to the trial court's attention for resolution. (*Schroeder v. Meier-Templeton Associates, Inc.* (1984), 130 Ill. App. 3d 554, 559, 474 N.E.2d 744, 749.) Because the trial court did not rule on the motion, we must consider any objection the Bauers had to the affidavit waived. We cannot review a motion on appeal that the court below did not rule upon or consider. (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147, 324 N.E.2d 417, 420; *Schroeder*, 130 Ill. App. 3d at 559, 474 N.E.2d at 749.) Consequently, the facts contained in the affidavit can be properly considered as part of the record on appeal. We find that the affidavit supports the ruling of the trial court that specific performance of the contract would provide an inequitable result for the Gordons. We, therefore, hold that the trial court properly dismissed the Gordons' specific performance claims and that the court, acting in equity, could properly award the damages prayed for by the Gordons.

Our holding above will easily dispense with the next four issues presented by the Bauers. The second and third issues they raise concern waiver and estoppel. As we noted earlier, the Gordons pled for damages in equity. The Bauers contend that once the court dismissed the specific performance claims it could no longer award damage relief incidental to specific performance. The Bauers maintain that when the trial court dismissed the specific performance claims, it improperly continued to hear the damage claims as actions at law, not in equity. The Bauers argue that the Gordons had the chance to alternately plead for damages at law in their original complaint, but failed to do so. Thus, the Bauers allege that the Gordons waived any right they had to damages at law and, alternately, that the Gordons should be estopped from requesting such relief because of the substantial prejudice to the Bauers.

■ Neither the waiver nor the estoppel argument is persuasive. As we held earlier, the damages awarded to the Gordons were in the form of equitable relief which the trial court could properly grant even after dismissing the specific performance claims. Consequently, whether the Gordons waived their right to damages at law or whether they should be estopped from seeking damages at law is simply irrelevant.

■ Likewise, the Bauers' fourth argument, that they were wrongfully denied their right to a jury, is also irrelevant. The Bauers premise this contention on the supposition that the court awarded

damages at law. If the court had acted at law, the Bauers could have requested a jury trial and the court could have granted that request at its discretion. (*Zurich Insurance Co. v. Raymark Industries, Inc.* (1986), 145 Ill. App. 3d 175, 196, 494 N.E.2d 634, 648.) Because the court acted in equity, however, the Bauers were not entitled to a jury trial (*Zurich*, 145 Ill. App. 3d at 196, 494 N.E.2d at 648), and thus the court did not act improperly by continuing with the bench trial.

■ The Bauers' fifth contention is that the court abused its discretion when it allowed the Gordons to amend their complaint to conform to the proofs. The Bauers argue that the Gordons' amended complaint prejudiced the Bauers because the amendments altered the cause from an action in equity to an action at law. Because the Gordons' amended complaint deleted the allegation in their original complaint that they had an inadequate remedy at law, and because a party has to allege that he or she has an inadequate remedy at law in order to be awarded specific performance, the Bauers contend that the Gordons' amendments altered their suit to an action at law. The Bauers also note that the Gordons' attorney initially argued at trial that the dismissal of the specific performance claims left the court with an action at law. This one deletion in the amended complaint, and the attorney's argument, however, did not alter the cause of action. The trial court held that it was proceeding in equity to hear the damage claims, and that is the ruling upon which we review this case. The Gordons merely amended their complaint to conform to what they proved at trial. The trial court did not abuse its discretion by allowing the Gordons to amend their pleadings after trial to conform to the proofs. (Ill. Rev. Stat. 1985, ch. 110, par. 2—616(c); *Fultz v. Haugan* (1971), 49 Ill. 2d 131, 136, 305 N.E.2d 873, 876.) All of the cases. the Bauers cite for support, including *Blazina* (42 Ill. App. 3d at 159, 356 N.E.2d at 164), *Di Benedetto v. County of Du Page* (1986), 141 Ill. App. 3d 675, 491 N.E.2d 13, *Mentesana v. LaFranco* (1979), 73 Ill. App. 3d 204, 391 N.E.2d 416, and *First National Bank & Trust Co. v. Sousanes* (1978), 66 Ill. App. 3d 394, 384 N.E.2d 30, concern amendments other than those which conform to the proofs, such as amendments to add a party, a new cause of action or a new type of relief. Thus, those cases are inapplicable to the case at bar.

The Bauers' sixth contention is that the contracts lacked mutuality of obligation and remedy. The Bauers base their position on one line in both contracts which stated that the contracts were "subject to existing leases other than oil leases." A real estate agent employed by Schafer, Douglas R. Hankins, handled the Bauer-Gordon transactions and wrote that language into the contracts at the request of Dale

Gordon. The testimony at trial revealed that although the Gordons were willing to accept title to the property subject to oil leases and mineral reservations, they wanted to reserve the right to examine what, if any, rights or leases the Natural Gas Pipeline of America had to the surface uses of the property. Dale Gordon testified that the contract language meant that the contracts were subject to what he found out about the leases. Gordon testified that he thought that if he did not like what he found out about the leases, he could cancel the contracts. The Bauers, therefore, argue that because the Gordons could unilaterally cancel the contracts, the contracts lacked mutuality of obligation, and thus were unenforceable. The Bauers also assert that the Gordons could specifically enforce the contracts with or without the leases. The Bauers maintain that they could not similarly enforce the contracts because they had to convey title, by the terms of the contracts, free of the oil leases. Thus, the contracts also lacked mutuality of remedy, according to the Bauers.

■■ ■ We believe that the Bauers' contentions concerning mutuality of remedy and mutuality of obligation lack merit. We initially note that there is "no requirement that parties to a contract have mutual remedies in the event of a breach." (*S.J. Groves & Sons Co. v. State of Illinois* (1982), 93 Ill. 2d 397, 404, 444 N.E.2d 131, 134; see *Gould v. Stelter* (1958), 14 Ill. 2d 376, 152 N.E.2d 869.) The requirement of mutuality of obligation, however, still exists. (*S.J. Groves*, 93 Ill. 2d at 403-04, 444 N.E.2d at 134.) The Bauers assert that the two requirements are interchangeable under certain factual circumstances and that mutuality of remedy is still a requirement. (*Giannini v. First National Bank* (1985), 136 Ill. App. 3d 971, 980, 483 N.E.2d 924, 932.) While the obligations of the parties to the contract may have an effect on the remedies available to each of them, our supreme court has pointed out that a distinction does exist between the two mutuality requirements. (*S.J. Groves*, 93 Ill. 2d at 403-04, 444 N.E.2d at 134.) We recognize that *Giannini*, an appellate court case cited by the Bauers, is a more recent case, but both *Gould* and *S.J. Groves* are supreme court cases which hold that mutuality of remedy is not a requirement. *Gould* and *S.J. Groves*, therefore, take precedence over *Giannini*.

Although a contract, under certain circumstances, must have mutuality of obligation, the Bauers waived this argument because they did not assert it at trial. In the Bauers' affirmative defenses, they argued lack of mutual remedy, but they did not argue lack of mutual obligation. The Bauers contend that they impliedly raised the mutual obligation issue by asking Dale Gordon at trial whether he thought he

could cancel the contracts. We hold that because the Bauers did not explicitly raise this issue at the trial level, it is deemed waived on appeal. *Kravis*, 60 Ill. 2d at 147, 324 N.E.2d at 420.

■ ■ In any event, we believe the contracts did not lack mutuality of obligation. The contracts contained no provisions which made them expressly terminable upon the will of the Gordons. The contracts merely provided that the sale of the land was subject to any existing leases, except oil leases. Although Dale Gordon testified that he *thought* he could rescind the contracts if he did not approve of the oil leases, that does not mean that he had the *actual power* to void the contracts at his option. In addition, the meaning of a contract is determined from the words used, and a court will use the plain and obvious meaning of the words in construing a contract. (*Johnstowne Centre Partnership v. Chin* (1983), 99 Ill. 2d 284, 287, 458 N.E.2d 480, 481.) A court also will not add language or matters to a contract about which the document is silent. *Johnson v. Continental Illinois National Bank & Trust Co.* (1967), 88 Ill. App. 2d 124, 129, 232 N.E.2d 59, 62.

Nevertheless, a "contract does not lack mutuality merely because its obligations appear unequal or because every obligation or right is not met by an equivalent counterobligation or right in the other party." (*Cox v. Grant* (1978), 57 Ill. App. 3d 922, 926, 373 N.E.2d 820, 823.) The requirement is met if each party has given adequate consideration for the other's promise. (*Dwyer v. Graham* (1982), 110 Ill. App. 3d 316, 324, 442 N.E.2d 298, 304.) Moreover, "even assuming the mutuality requirement was not satisfied at the contract's inception, it is a well settled rule of law that want of mutuality of obligation is no defense where the contract is executed or where *** a party who was not bound to perform does perform." (*Dwyer*, 110 Ill. App. 3d at 325, 442 N.E.2d at 304.) Thus, even if the Gordons could have terminated the contracts at will prior to closing, they bound themselves when they performed their part of the contracts by tendering payment. Consequently, lack of mutuality of obligation was not an available defense for the Bauers once the Gordons performed.

The Bauers correctly cite *Stender v. National Bank* (1983), 114 Ill. App. 3d 1041, 449 N.E.2d 873, for the proposition that "[m]utuality of obligation is lacking, and neither party is bound to an executory contract where one of the parties has the right to arbitrarily terminate it." (*Stender*, 114 Ill. App. 3d at 1049, 449 N.E.2d at 878, quoting *Gardiakos v. Vanguard Communications, Inc.* (1976), 38 Ill. App. 3d 937, 939, 350 N.E.2d 210, 212.) We find *Stender* and *Gardiakos* distinguishable on their facts, however, because in both of those cases

the alleged contracts contained clauses that expressly gave one party the discretion to terminate the contracts. (See *Stender*, 114 Ill. App. 3d at 1049, 449 N.E.2d at 878; *Gardiakos*, 38 Ill. App. 3d at 939, 350 N.E.2d at 211.) The Bauer-Gordon contracts did not expressly contain this type of provision.

■■ ■ The Bauers' seventh argument is that the Gordons illegally obtained the consideration tendered for the purchase of the properties. This action rendered the contracts void and unenforceable, and thereby excused the Bauers' performance, according to the Bauers. The Gordons arranged for permanent financing from John Hancock, but because this would not be available in time for closing, the Gordons attempted to obtain a bridge loan in the amount of $210,000 from the State Bank of Cowden (Cowden) to permit closing. John Hancock would then provide permanent financing after closing. The record reveals that Cowden's legal lending limit was $100,000. Through a participation loan, however, Cowden arranged to have the remaining $110,000 loaned to the Gordons by the Bank of Charleston (Charleston). At closing on April 30, 1983, the Gordons tendered two checks, in the amount of $151,000 and $59,560 each. The Gordons also presented a letter from Cowden dated April 29, 1983, which stated that the checks would be honored upon presentation. Testimony from Phillip Maton, president of Cowden, however, revealed that Cowden did not have the actual participation of or funds from Charleston until May 2, 1983, although Cowden had prior approval from Charleston for the loan. The Bauers argue, therefore, that because Cowden did not have the participation of Charleston until after the closing date, Cowden did not have the legal authority to loan the Gordons more than $100,000 on the day of closing. The Bauers cite 12 Illinois Law and Practice *Contracts* section 218 for the proposition that "[i]f any part of an entire consideration for a promise or any part of an *entire* promise is illegal, *** the whole contract is void." (Emphasis added.) (12 Ill. L. & Prac. *Contracts* §218 (1983).) Consequently, the Bauers maintain that the consideration tendered by the Gordons was obtained illegally, and as a result, the Gordons cannot enforce the contracts.

The Gordons correctly point out that the validity of the checks is irrelevant because the Bauers did not even come to the closing and refused to tender the deeds. "[S]ubject to some exceptions, either party desiring to place the other in default, must perform, or offer to perform ***. If one party unconditionally refuses [to perform], *** when the time arrives, then a performance, or a tender of performance, by the other party, is unnecessary." (*Gerrish v. Maher* (1873), 70

Ill. 470, 474.) Thus, the Gordons had no obligation to tender payment because the Bauers refused to tender the deeds. The Bauers breached the contracts by not tendering performance.

The Bauers cite *People v. Drury* (1928), 250 Ill. App. 547, *aff'd* (1929), 335 Ill. 539, 167 N.E. 823, for the proposition that an agreement between a borrower and a bank to loan money in excess of the legal loan limit of the bank is unlawful and constitutes conspiracy regardless of the faith of the bank in the borrower's honesty. Upon a review of *Drury*, however, we do not believe that is the correct holding of the case. We also find *Drury* to be factually dissimilar from the case at bar.

Even if the Gordons had to tender payment, however, we find nothing in the procurement of the checks which would invalidate them or give the Bauers a reason for not performing under the contracts. The Bauers allege that the loan was illegal because Cowden issued the checks before it officially had the participation of Charleston on May 2. This entire argument is meritless, however, because regardless of whether Cowden could legally dispense the funds prior to May 2, this did not excuse the Bauers from performance. When the Gordons tendered the checks at closing, they fulfilled their obligation under the contracts, regardless of whether Cowden would honor the checks upon presentation. We note that with any check there is always the risk or possibility that a bank will, either rightly or wrongly, dishonor the check. (When the Gordons tendered the checks, Schafer deposited them in his escrow account, and Cowden honored the checks upon presentation.) If Cowden had refused to honor the checks because it made a mistake in issuing the checks prior to May 2, any liability would rest with Cowden. The Bauers' remedy, however, was not nonperformance of the contracts.

If the Bauers did not want to accept the checks, they could have insisted on payment in cash. Unless the parties agree otherwise, "tender must be made in money or in that which by law passes as money for the payment of debts." (*Margulus v. Mathes* (1950), 339 Ill. App. 497, 500, 90 N.E.2d 254, 256, quoting 40 Am. Jur. *Payment* §41 (1942).) Payment by check, however, "is not legal tender where objection is made at the time to this form of tender." (*Margulus*, 339 Ill. App. at 500, 90 N.E.2d at 256.) The contracts in the case at bar did not specify how payment was to be made, and although the Bauers objected to the checks, they did not insist on payment in cash at the closing. In addition, the Bauers accepted the Gordons' check for $1,000 for the earnest money, so the Gordons had a right to assume that the Bauers would accept the final payment by check. (See *Comp-*

*ton v. Weber* (1921), 296 Ill. 412, 417, 129 N.E. 764, 767.) Even if the Bauers had insisted at closing on payment in cash, the Gordons, in turn, could have insisted on a reasonable time to procure the money. (*Margulus*, 339 Ill. App. at 501, 90 N.E.2d at 256.) Consequently, we do not believe that the Cowden loan and checks constituted illegal consideration such that the Bauers could refuse to perform.

The Bauers cite *Frederick v. Frederick* (1976), 44 Ill. App. 3d 578, 358 N.E.2d 398, *Statistical Tabulating Corp. v. Hauck* (1973), 10 Ill. App. 3d 50, and *Metzger v. Tidd* (1943), 318 Ill. App. 2d 638, 48 N.E.2d 452, for support. Those cases, however, are distinguishable. In *Frederick*, the court found the contract illegal and therefore unenforceable because the purpose of the contract was to defraud the United States government out of tax money. The court in *Statistical Tabulating Corp.* held that a restrictive covenant in defendant's employment contract was unreasonable and thus unenforceable. The court did not consider whether the agreement was based on sufficient consideration. In *Metzger,* the court held that a party's promise to allow his wife to obtain a divorce in consideration for the release of a debt was an illegal promise which rendered the contract unenforceable.

The Bauers also allege that the judgment was procured by fraud because the two checks and the letter of credit were fraudulent. Although it is true that a judgment procured by fraud is considered void (*Federal Sign & Signal Corp. v. Czubak* (1978), 57 Ill. App. 3d 176, 179, 372 N.E.2d 965, 967), the Bauers presented no evidence that the judgment was procured by fraud. We have already held that the checks and letter of credit did not excuse the Bauers' nonperformance. Even if the checks and letter were fraudulent, we fail to see how this would render the judgment itself fraudulent, or show that the Gordons or Schafer used fraudulent means to obtain the judgment.

The eighth and last issue the Bauers raise against the Gordons is that the trial court improperly awarded unforeseeable damages. The Bauers contend that the nonrefundable deposit to John Hancock was not forseeable because they were not advised that the Gordons had to make such a deposit. The Bauers admit they knew that the Gordons applied for the loan, but they thought that the Gordons could not obtain the loan and thus that the Gordons did not make a deposit. The Bauers assert that the accrued interest on the loan was not foreseeable because Dale Gordon and Schafer testified that they never told the Bauers that Schafer deposited the loan proceeds into Schafer's escrow account instead of tendering the proceeds

back to Cowden. The Bauers also allege that the wheat crop damages were not foreseeable. They point out that Dale Gordon testified that he did not have any money or time invested in the wheat crop. The Bauers argue that the PIK program and basic program damages were not foreseeable because the PIK and basic programs were not a part of the contracts and the Gordons never discussed the programs with them. Roger West of the ASCS testified that he did not remember telling the Bauers what acreage limitation was needed to keep the Gordons in compliance with the programs. West also testified that the Gordons could not legally participate in the programs when they did not own the land before April 30, 1983. Based on this evidence, the Bauers argue that they could not be held liable for these damages because the damages could not have been contemplated at the inception or upon the breach of the contracts.

As a contingent argument, the Bauers note that West testified that the Gordons received $2,116.48 from the ASCS for the wheat harvested from the two tracts of land. The Bauers contend that in awarding damages, the trial court failed to apply this credit to the Bauers' favor. The Bauers failed to raise this issue in their post-trial motion, however, so it is waived on appeal. *Kravis*, 60 Ill. 2d at 147, 324 N.E.2d at 420.

The Gordons initially contend that the Bauers failed to present the unforeseeability issue at trial and therefore waived it on appeal. The record reflects that the Bauers raised the issue of the foreseeability of damages in their motion to strike portions of plaintiffs' amended counts III and IV. The record also reveals that the trial court did not rule on this motion. Again, we will not review an issue not considered by the trial court. Consequently, the issue was waived. *Schroeder*, 130 Ill. App. 3d at 559, 474 N.E.2d at 749; *Kravis*, 60 Ill. 2d at 147, 324 N.E.2d at 420.

▪ In any event, there is no question that the damages were foreseeable. The Bauers rightly point out a "person breaching a contract can [only] be held liable for such damages as may fairly and reasonably be considered as naturally arising from the breach thereof in light of the facts known or which *should have been known* or such as may *reasonably be supposed to have been within the contemplation of the parties* as a probable result of a breach thereof." (Emphasis added.) (*Case Prestressing Corp. v. Chicago College of Osteopathic Medicine* (1983), 118 Ill. App. 3d 782, 788, 455 N.E.2d 811, 816.) The record reveals that Donald Bauer signed an ASCS form on March 8, 1983, which stated that he sold 116 acres and which transferred said acres into Dale Gordon's ASCS programs. The Bauers, therefore,

knew that the two pieces of land would be involved in whatever ASCS programs the Gordons elected to participate; thus, the Bauers should have known that penalties could be assessed by the ASCS against the Gordons for failure to comply with the programs.

The other damages were also foreseeable. A sale of land naturally involves a transfer of title. Donald Bauer testified that he had purchased and sold land on prior occasions. Thus, the Bauers should have known that a new title would be ordered and that the Gordons would incur a cost for obtaining the title. In addition, the contracts explicitly provided that the buyer would obtain the wheat crop presently on the property. Thus, the Bauers clearly could have anticipated that upon breach of the contracts, the Gordons could recover the proceeds from the sale of the wheat regardless of who planted and harvested the crop. Finally, the Bauers admit that they knew the Gordons had to apply for a loan, so the loan deposit was also foreseeable.

The Bauers imply that the damages must have been *actually* contemplated by the parties or made part of the contracts in order to be awarded. *Case Prestressing* clearly states that the damages only need to arise from facts which the parties should have known or which were reasonably within the contemplation of the parties. Under this standard and under the circumstances of the case at bar, the PIK program and basic program damages, the title assessment damages, the wheat crop damages and the loan damages were certainly foreseeable.

The Bauers cite *Rivenbark v. Finis P. Ernest, Inc.* (1976), 37 Ill. App. 3d 536, 346 N.E.2d 494, and *Spangler v. Holthusen* (1978), 61 Ill. App. 3d 74, 378 N.E.2d 304, which we find inapplicable. Both cases dealt principally with damages recoverable for lost profits, which is not at issue in the case at bar. We also note that where those cases discuss the forseeability of damages in general, they are not inconsistent with the holding of *Case Prestressing*.

The remaining issues the Bauers raise concern their third-party action against Schafer. They initially allege that the Gordons were not ready, willing and able to buy the real estate, and therefore Schafer was not entitled to his sales commission. The Bauers assert three reasons for their position. The Bauers first rely on their theory that the loan and letter of credit from Cowden were fraudulent because participation from Charleston did not occur until after closing. Thus, according to the Bauers, the Gordons were not ready or able to purchase the real estate because they neither had sufficient funds on hand, nor could command sufficient funds to fulfill their obligations under the contracts.

The Bauers correctly note that a real estate agent only re-

ceives his or her commission if the agent produces a purchaser who is ready, willing and able to buy. (*United Investors, Inc. v. Tsotsos* (1985), 132 Ill. App. 3d 175, 178, 477 N.E.2d 40, 42.) "Where a seller of real estate[, however,] enters into an enforceable contract of sale with a purchaser procured by a broker, the readiness, willingness and ability of the purchaser is no longer open to question and the broker's right to compensation accrues whether or not the sale is completed." (*United Investors*, 132 Ill. App. 3d at 178, 477 N.E.2d at 42; see *Wilson v. Mason* (1895), 158 Ill. 304, 311, 42 N.E. 134.) Thus, Schafer earned his commission when the Bauers and Gordons signed the contracts.

The Bauers cite *Telander v. Posejpal* (1981), 94 Ill. App. 3d 616, 418 N.E.2d 444, for the proposition that where the transaction is dependent on the purchaser obtaining a loan, the agent cannot receive the commission if the purchaser cannot secure the loan. A purchaser is only deemed ready and able to buy if he or she "has sufficient funds on hand or if he [or she] is able to command the necessary funds with which to complete the purchase within the time set by the offer." (*Telander*, 94 Ill. App. 3d at 624-25, 418 N.E.2d at 452.) While this general proposition of *Telander* is true, we believe the facts in *Telander* are distinguishable. In *Telander*, the contract for sale contained an express condition that the sale was contingent upon the purchaser procuring within 150 days of the date of the contract a firm commitment for a loan. The purchaser did not fulfill the condition and the real estate broker argued that he was entitled to his commission, regardless of whether the sale was completed, because the purchaser was ready, willing and able to buy. The appellate court held that because the contract was dependent on the loan condition, the agreement to pay the real estate commission was also dependent on the condition unless the seller waived the ready, willing and able requirement. *Telander*, 94 Ill. App. 3d at 625, 418 N.E.2d at 452.

In the case at bar, on the other hand, the record reveals that the contracts did *not* include a provision that the sale was contingent upon the Gordons securing a loan. Thus, we cannot imply such a condition on the real estate listing agreement between the Bauers and Schafer. Moreover, the listing agreement did not contain an express provision that Schafer's commission was conditioned upon the buyer securing a loan. The court in *United Investors* also distinguished *Telander* for the same reasons. After reviewing the facts and holding of *Telander*, the *United Investors* court noted:

"Such considerations, however, have little relevance where an unconditional, enforceable purchase agreement exists between

a buyer and a seller. By entering into such a contract, the seller is precluded from asserting that the buyer was not ready, willing and able to purchase the property, and the broker is entitled to his commission even if the sale is never consummated. [Citations.] Since the sales contract in the case at bar is clearly not subject to any contingency, *Telander* is not controlling. Accordingly, plaintiff's commission accrued when the unconditional contract of sale was executed \*\*\*." (*United Investors*, 132 Ill. App. 3d at 179, 477 N.E.2d at 43.)

The Bauers point out that prior offers by the Gordons to the Bauers included provisions that explicitly made the transactions subject to the Gordons obtaining a loan. The Bauers contend that it is irrelevant that the provision was not in the final contracts because both parties and Schafer knew that the Gordons had to obtain a loan in order to purchase the properties. Regardless of why the contingent language was dropped from the contracts, the contracts were not conditioned on the loan and we will not read such a condition into them. (See *Johnson*, 88 Ill. App. 2d at 129, 232 N.E.2d at 62.) We, therefore, hold that Schafer was entitled to his commission once the Bauers and the Gordons signed the contracts, regardless of whether the Gordons could secure a loan.

The Bauers next argue that the Gordons were not ready, willing and able buyers because the Gordons depended upon the finances of a third person who was not bound to furnish the funds. The Bauers contend that the Gordons relied upon the collateral of Jim Gordon, Dale Gordon's brother, to obtain the loan from Cowden, but that Jim Gordon had no duty under the contracts to furnish the funds to purchase the property. The Bauers point to *Nelson v. Bolton* (1979), 72 Ill. App. 3d 519, 525, 391 N.E.2d 182, 186, citing *Epstein v. Howard* (1955), 5 Ill. App. 2d 553, 558, 126 N.E.2d 162, 164, for the proposition that a "purchaser is not shown to have financial ability if he is depending upon third persons who are in no way bound to furnish the funds." While this is true, *Nelson* and *Epstein* are distinguishable. In *Nelson*, the purchaser admitted that he could only obtain a loan for $95,000 of the $155,000 he needed to buy the real estate, but that he had a plan for obtaining the balance of the funds. The *Nelson* court held that it was not sufficient that the purchaser merely contemplated a scheme or plan to raise the funds. (*Nelson*, 72 Ill. App. 3d at 525, 391 N.E.2d at 186.) In *Epstein*, the offer to purchase the real estate was made by Cohen, for himself and as an agent for two undisclosed principals. The offer carried no name, and a rider attached to the offer carried only Cohen's name. The evidence was un-

clear as to how much of the $138,000 cash payments Cohen himself was financially able to pay. The parties did not dispute that the two principals had the ability to pay, but Cohen did not present any evidence that he could command the funds necessary to make the purchase in his own name. *Epstein*, 5 Ill. App. 2d at 558.

In contrast, the Gordons did not rely on the financial ability of Jim Gordon to consummate the transactions. Testimony revealed that the Gordons had a net worth of approximately $400,000 in 1983. Moreover, Maton testified that although the Gordons, in order to obtain the Cowden loan, offered collateral in which Jim Gordon had an interest, the bank would have approved the loan without the collateral. In any event, the Bauers would have received the loan proceeds for the purchases, and therefore they would not have been adversely affected even if the Gordons defaulted on the loan. Thus, the Bauers' position lacks merit.

▪ The third reason the Bauers assert that the Gordons were not ready, willing and able buyers is that the Gordons did not have certain documents necessary to effectuate the transactions available and ready at closing. The Gordons maintain that the documents required to close the transactions were ready and that any documents not available was the fault of the Bauers. We hold that regardless of which documents were prepared and ready by closing, the Gordons were ready, willing and able purchasers. As we noted earlier, when the seller enters into an enforceable contract with a purchaser to sell real estate, the readiness, willingness and ability of the purchaser is no longer open to question and the broker's right to compensation accrues regardless of whether the sale is completed. (*United Investors*, 132 Ill. App. 3d at 178, 477 N.E.2d at 42.) Consequently, Schafer earned his commission when the Bauers and the Gordons signed the contracts.

The Bauers cite *Nelson* for support, but we find *Nelson* distinguishable. In *Nelson*, Jacobs and Bolton entered into two contracts, one in which Jacobs sold land to Bolton and one in which Jacobs purchased land from Bolton. Both contracts were contingent upon the other closing. The contract in which Jacobs was the seller contained three express contingencies: (1) the exact legal descriptions of the property would be clarified prior to closing; (2) Jacobs would record a road easement prior to closing; and (3) Bolton would obtain a commitment for a mortgage loan within 21 days. The contract in which Jacobs was the purchaser also contained a mortgage loan contingency. The sales were not consummated. The court held that Jacobs was not an able buyer because the loan contingency was not met. (*Nelson*, 72

Ill. App. 3d at 524-26, 391 N.E.2d at 185-86.) As we stated earlier in regard to *Telander*, if the sale contracts contain contingencies, the broker is not entitled to his or her commission until those contingencies are met. In addition, the *Nelson* court held that Jacobs also was not a ready purchaser because the legal descriptions of the lots had not been clarified, no deed for the property had been prepared, and the easement had not been recorded. (*Nelson*, 72 Ill. App. 3d at 526, 391 N.E.2d at 186.) The contracts were expressly contingent upon the performance of each of these three acts. On the other hand, the only documents expressly required by the contracts between the Bauers and the Gordons were the abstracts of title or the title policies and the warranty deeds. The taxes were also required to be prorated at closing. The record reveals that Schafer presented sufficient evidence such that the trial court could have concluded that these documents were ready at closing.

The Bauers' final contention is that Schafer is not entitled to his commission because he breached his fiduciary duty of loyalty to the Bauers. A broker owes a fiduciary duty of loyalty to the seller which requires that the broker keep the seller fully informed of all pertinent facts regarding the transaction. (*United Investors*, 132 Ill. App. 3d at 179, 477 N.E.2d at 43.) If the duty is breached, the broker is precluded from receiving his or her commission. (*United Investors*, 132 Ill. App. 3d at 180, 477 N.E.2d at 43.) The Bauers not only argue that Schafer did not keep them fully informed of the material facts concerning the transactions, but also that Schafer performed other acts which showed that he was not acting in the Bauers' best interests. The Bauers contend that Schafer did not try to communicate with them on the day of closing; that he did not attempt to discover the identity of and did not communicate with the Bauers' attorney; that he did not confer with the Bauers' attorney regarding the title exceptions; that he never informed the Bauers that he received a letter of credit from the State Bank of Cowden; that he attempted to close the transaction on April 30 and May 12, 1983, against the Bauers' express wishes; that he did not inform the Bauers or their attorney that he retained the Gordons' purchase money; that he signed an agreement with the Gordons relieving himself of liability for any damages the Gordons suffered; and that he failed to complete all of the documents necessary to complete the closing.

Contrary to the Bauers' allegations, the Gordons presented sufficient evidence to support the trial court's decision that Schafer did not breach his fiduciary duty. Hankins testified that he telephoned defendant Lauretta Bauer on the day of the closing and informed her

that the Gordons had tendered payment and fulfilled all of their obligations. Moreover, the record discloses that Schafer sent a letter to the Bauers dated April 30, 1983, which informed the Bauers that the Gordons tendered payment and fulfilled their obligations under the contracts. Schafer testified that he informed the Bauers of the exceptions in the commitment for title insurance on April 25, 1983, the date on which Schafer received the commitment for the title policy. Schafer testified that on April 29, 1983, he called the Bauers and advised them that the closing would take place on April 30, 1983. He also testified that he thought he told them that the Gordons had waived all of the title exceptions. In addition, Schafer's April 30 letter to the Bauers stated that "[a]ll problems have been cleared sufficiently or waived so that this transaction can be completed." Hankins testified that the Bauers did not advise him that they had hired an attorney until April 27, 1983, and even then they did not identify the attorney. During the conversation, however, the Bauers arranged to have their attorney meet with both Hankins and Schafer at the Effingham courthouse the following day, but Schafer and Hankins testified that neither the Bauers nor their attorney appeared for the meeting. Defendant Donald Bauer admitted that Hankins called him at least once a week concerning the transactions.

Schafer also properly tried to close the transactions. The contracts stated that closing was to occur no later than May 1, 1983. Thus, Schafer gave the Bauers a chance to close without breaching the contracts. He also tried to minimize the damages caused by the Bauers' breach by arranging to close even after May 1.

Schafer admits that he entered into an agreement with the Gordons in which they agreed to hold him harmless for returning to them on August 5, 1983, the funds they tendered on April 30, 1983. The Bauers assert that they sent a letter to the Gordons on May 16, 1983, which stated that they hoped the Gordons would obtain the purchase money from Schafer because they did not intend to close. Schafer testified, however, that the Bauers never advised him about what they wanted to do with the tendered purchase money. The trial court awarded the Gordons $3,606.45 representing net interest incurred on the sum the Gordons borrowed to finance the purchase. The court noted that the Gordons mitigated the damage to the Bauers by earning interest on the sum while holding it a reasonable time in an effort to effectuate a closing. The Gordons presented evidence that they tried to close the transaction after April 30, 1983. Under these circumstances, we cannot say that Schafer breached his duty of loyalty. In fact, by disbursing the tendered payment back to the Gordons,

Schafer helped lessen the damages to the Bauers by stopping the accrual of interest. Moreover, by holding the money for what we and the trial court believe was a reasonable period, Schafer gave the Bauers time to close the transactions and remedy the breach. Although Schafer testified that he did not consult with the Bauers or their attorney regarding the disbursal of the funds to the Gordons, the Bauers knew that the Gordons had tendered the money and yet they did not advise Schafer as to what to do with the money. Furthermore, it was not necessary for Schafer to advise the Bauers of the Gordon-Schafer agreement because the agreement had no effect on the relationship between the Bauers and Schafer. The agreement merely insulated Schafer from liability from the Gordons; it did not adversely affect Schafer's relationship with or responsibility to the Bauers.

The Bauers do not cite and we cannot locate any authority for their proposition that Schafer's alleged failure to prepare the documents in time for closing constituted a breach of fiduciary duty. The contracts stated that the seller would provide evidence of good title, would convey the property by warranty deed, and would pay all taxes which would be prorated on the day of closing. As we noted earlier, however, neither the contracts nor the listing agreement expressly required the broker to prepare the documents for closing. Real estate brokers frequently perform these services for their clients, but we cannot imply such a duty where none was expressed. A broker can fulfill his or her duty of loyalty without procuring all of the documents for closing. In any event, Schafer produced sufficient evidence that he helped obtain the documents necessary for closing and that all of the documents required by the contracts were prepared in time for closing.

Citing *Duffy v. Setchell* (1976), 38 Ill. App. 3d 146, 347 N.E.2d 218, the Bauers also contend that Schafer breached his fiduciary duty of loyalty by acting as an agent of the Gordons without disclosing the agency to the Bauers. The Bauers argue that Schafer's act of arranging the second closing on May 12, 1983, without notice or authorization by the Bauers or their attorney demonstrated that Schafer was working for the Gordons. Schafer testified, however, that the Gordons' attorney arranged the second closing and notified the Bauers. In addition, we find *Duffy* distinguishable on its facts. The *Duffy* court did hold that a broker who acts for both the buyer and seller without the full knowledge of both cannot recover compensation from either party. (*Duffy*, 38 Ill. App. 3d at 150, 347 N.E.2d at 222.) In *Duffy*, however, the buyer specifically asked the broker to contact

the seller regarding a particular piece of property. The broker did not reveal to the seller that he had previous contact with the buyer. Moreover, the broker negotiated the terms of the sale at a price less than what the seller wanted and less than what the buyer said she would be willing to pay. *Duffy*, 38 Ill. App. 3d at 149, 347 N.E.2d at 221.

The record reveals that Schafer had no contact with the Gordons prior to the execution of the listing agreement with the Bauers. It makes no difference that the Gordons contacted another real estate broker about the Bauer land prior to Schafer's contact with the Gordons. The record reflects that during negotiations Schafer did not suggest to the Gordons that they purchase the property for less than the listed price, and in fact Schafer suggested an alternative to the counteroffer proposed by the Bauers which resulted in the Bauers receiving an extra $1,000 for their property over the amount they would have received had they made their intended counteroffer. Thus, Schafer did not act as an agent for the Gordons and did not breach his fiduciary duty to the Bauers.

For the foregoing reasons, we affirm the judgment of the circuit court of Effingham County.

Affirmed.

HARRISON, P.J., and WELCH, J., concur.