2021 IL App (1st) 191575-U

SIXTH DIVISION
March 31, 2021

No. 1-19-1575

NOTICE: "This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1)."

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| SAM HORN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| MANIJEH BAYZAEE, Individually and As Co-Trustee | ) | No. 2005 CH 06130 |
| of the Albofazl Bayzaee Trust; and ALBOFAZL | ) | |
| BAYZAEE, Individually and As Co-Trustee of the | ) | |
| Albofazl Bayzaee Trust, | ) | |
| | ) | Honorable |
| Defendants-Appellees. | ) | Neil Cohen, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**O R D E R**

¶ 1    *Held*:  The judgment of the trial court is affirmed. The trial court properly found that plaintiff could not recover because he failed to prove that, at the time the defendants anticipatorily breached the parties' option contract, plaintiff was ready, willing, and able to exercise his option to buy the building back at the agreed-upon price.

¶ 2    In 1994, plaintiff Sam Horn entered into an agreement with defendant Manijeh Bayzaee to

sell a building he owned to Ms. Bayzaee and her husband with the understanding that he would

have an opportunity to repurchase the building within one year of the sale. Mr. Horn claims he exercised his option and Ms. Bayzaee refused to sell him back the building. After a bench trial, the trial court found that Mr. Horn failed to show that Ms. Bayzaee had breached their contract because he was unable to show that he was ready, willing, and able to repurchase the building when, according to him, he exercised his option to do so.

¶ 3       Mr. Horn now appeals, arguing that the trial court erred by (1) applying the ready, willing, and able requirement to the repurchase option; (2) making a factual finding that he was not, in fact, ready, willing, and able to repurchase; and (3) denying his motion to amend the pleadings to conform to the proofs. For the following reasons, we affirm the judgment of the trial court.

¶ 4                          I. BACKGROUND

¶ 5       This case has been pending since 2005, and this is the third appeal to this court. The controversy stems from a 1994 contract entered into between Mr. Horn and Ms. Bayzaee, together with her husband, Albofazl Bayzaee, for Mr. Horn to rebuy the apartment building that he sold to the Bayzaees (the Kenton property). The case is before us following a bench trial and a judgment in favor of the Bayzaees.

¶ 6       Prior to the current litigation, there were two other lawsuits related to this transaction. First, Mr. Horn filed a complaint in January 1996 to foreclose on a mortgage securing a $16,500 note from the Bayzaees to Mr. Horn that constituted a portion of the Bayzaees' payment when they bought the building from him. In January 1998, the Bayzaees redeemed the $16,500 note and Mr. Horn dismissed the foreclosure suit against them. In 2002, Mr. Horn filed his first lawsuit seeking specific performance on the repurchase agreement. That suit was voluntarily dismissed when it appeared that the parties had resolved the matter through mediation. Mediation ultimately failed, however, and on April 4, 2005, Mr. Horn refiled, initiating the lawsuit that is the subject of this

appeal.

¶ 7     On August 2, 2006, after having entered summary judgement in favor of the Bayzaees on these counts in the original complaint, the trial court dismissed counts I, II, and III, of Mr. Horn's amended complaint with prejudice, allowing only count IV to remain. The trial court made a Rule 304(a) finding and Mr. Horn timely filed a notice of appeal. While the appeal was pending, on October 9, 2007, Ms. Bayzaee refinanced the Kenton property for $499,000. She used a portion of the funds to pay off the existing mortgage on the property and the remaining funds to pay off a home equity loan on her personal residence. Ms. Bayzaee then ceased making payments on the Kenton property mortgage and it went into foreclosure.

¶ 8     In an unpublished decision filed on January 16, 2009, this court reversed the trial court's August 2, 2006, rulings in favor of the Bayzaees and remanded the case for further proceedings. *Horn v. Bayzaee*, 386 Ill. App. 3d 1117 (2009) (table) (unpublished order under Supreme Court Rule 23). This court held that the finding of summary judgment in favor of the Bayzaees was improper because (1) as to his claim of reformation, Mr. Horn "raised factual questions about mistake, fraud and intent" as to Ms. Bayzaee, (2) the evidence "sufficiently established a claim for recission based on fraud that should be submitted to a fact-finder," and (3) the question of whether Ms. Bayzaee was a fiduciary who obtained a benefit from the 1994 contract was a question of fact for the trier of fact and not properly decided on summary judgment.

¶ 9     After remand, on April 11, 2014, Mr. Horn filed a second amended complaint, adding a fifth claim for conversion (count V) in addition to his prior four claims. By the time the case went to trial, the property had been foreclosed upon.

¶ 10     The case proceeded to trial on June 23, 2015. Just before trial began, the trial court clarified that the only counts Mr. Horn was taking to trial were those for breach of contract and conversion,

as the equitable remedies of recission, reformation, and specific performance were no longer available to him once the Kenton property had been foreclosed on.

¶ 11    The parties stipulated to the procedural history outlined above as well as the following factual background. In April of 1994, Mr. Horn owned a four-unit apartment building at 8034 North Kenton Avenue in Skokie, Illinois, where he resided in one of the units. At that time, Mr. Horn's lender had threatened to foreclose on the building. Mr. Horn consulted Ms. Bayzaee, a real estate agent, for the purpose of listing the property for sale to avoid a foreclosure. Mr. Horn and Ms. Bayzaee negotiated an agreement whereby the Bayzaees would purchase Mr. Horn's building, giving Mr. Horn an option to repurchase the building within one year.

¶ 12    The parties agreed "that the purchase price would be the approximately $249,000 owed to [Mr.] Horn's lender plus the difference between that amount and the $295,000 appraised value." The parties also agreed that Ms. Bayzaee would provide $20,000 in earnest money and would give Mr. Horn a promissory note and a mortgage secured by the Kenton property in the amount of $16,500. The note was to serve as Mr. Horn's down payment if he exercised his option to repurchase the property. The repurchase price was to be $249,000 plus any payments Ms. Bayzaee made on the note, plus $25,000, plus the cost of any repairs made by Ms. Bayzaee up to $10,000.

¶ 13    Ms. Bayzaee prepared a contract for the sale of the building that did not include the agreed-to option for Mr. Horn to repurchase the Kenton property. On May 5, 1994, without attorney representation, Mr. Horn signed the contract.

¶ 14    The sale of the property from Mr. Horn to the Bayzaees closed on July 6, 1994. Ms. Bayzaee retained two attorneys for the closing—one for her and one for Mr. Horn. The settlement statement from the closing listed the earnest money paid as $7000 rather than the agreed-upon $20,000 in the contract. In fact, however, no earnest money payment was made prior to or at the

closing. Rather, Ms. Bayzaee tendered a check in the amount of $5000 to Mr. Horn at the closing, but through her counsel immediately directed him to endorse the check and re-tender it to her, which Mr. Horn did, based on the representation of Ms. Bayzaee's attorney that Mr. Horn would receive a new check for $7000 at a later time.

¶ 15    Mr. Horn's primary claim at trial was that he exercised his option to repurchase the property within the one year that the parties had agreed to, but that the Bayzaees refused to sell the property back to him. The Bayzaees' defense was that Mr. Horn in fact never exercised the option and that, even if he did, he was not ready, willing, and able to repurchase the property on the agreed-to terms. During the trial, much of the argument and testimony centered on whether Mr. Horn was ready, willing, and able to purchase the property.

¶ 16    In his opening statement, counsel for Mr. Horn said:

"The issue I think the Court will have to decide is whether [Mr. Horn] was ready, willing, and able to repurchase the property. ***

I believe that the defense to this claim is essentially that [Mr. Horn] was not able to do that. And we are prepared to present evidence to show that he was ready, willing, and able to repurchase the property."

¶ 17    Mr. Horn was the first witness to testify, and he said that he had bought the Kenton property in 1986 along with Jeff Serota. At some point before 1994, Mr. Serota transferred his interest in the building to Mr. Horn, making him the sole owner. Mr. Horn testified that, because his property was going into foreclosure in 1994, he approached Ms. Bayzaee about possibly selling the property. She instead suggested that they enter into a repurchase agreement. Mr. Horn said he was given no terms by which he needed to exercise his right to repurchase the property.

¶ 18    Mr. Horn said that in January 1995, approximately six months after he sold the property to

Ms. Bayzaee, he told her he wanted to repurchase it. He testified that they were in the basement of the property with an associate of Ms. Bayzaee's, two heating and air-conditioning repairmen, Mr. Serota, and Mr. Serota's daughter. Mr. Horn explained that they were all in the basement because the repairmen were there to fix the furnace, and he went downstairs to speak with Ms. Bayzaee about the condition of the property. Mr. Horn said his words to her, verbatim, were "I think it would be best if I bought the property back." Mr. Horn said Ms. Bayzaee responded, "I don't want to sell you the property back." Mr. Horn then testified:

"A. [Mr. Horn] Well, after she told me she just does not want to tell [*sic*] me the building back I said, well, then I will have to foreclose on the mortgage.

And she said you don't have the note.

And right at that moment it dawned on me I never did get the note from the attorney that Ms. Bayzaee hired for me.

Q. [Mr. Horn's attorney] When you speak of the note, what note?

A. The $29,500 second mortgage. And she said, you don't have the note.

And I thought, she's right, I don't have the note. Then I thought how does she know I don't have the note.

So I said to her—I said I will get it from my lawyer.

And she said that lawyer is dead."

¶ 19    Mr. Horn did attempt to get the note from his lawyer but was unable to. The lawyer was in fact deceased and had left no estate.

¶ 20    Mr. Horn testified that when he told Ms. Bayzaee he intended to repurchase his property, he did not have the full repurchase price, but he had a portion of it—the $29,500 Ms. Bayzaee owed him on the second mortgage that they had signed when she bought the property. Mr. Horn

was going to finance the rest of the repurchase price with a mortgage cosigned by Mr. Serota who "was in excellent financial condition right at that time." Without assistance, Mr. Horn agreed that he would not have been able to obtain a mortgage or repurchase the building—he was on a medical leave of absence from work and his sole source of income at the time was Social Security.

¶ 21    Mr. Horn explained that he and Mr. Serota had known each other for 35 years and were friends and business associates, and Mr. Serota had helped Mr. Horn financially in the past. To obtain financing for the property, Mr. Horn and Mr. Serota went to Gary Danno, a mortgage broker, and both filled out mortgage applications. Mr. Horn said that "after the full discussion about what the deal was and what the situation was [Mr. Danno] said he felt it would be no problem," but he could not make a mortgage without a contract. After that meeting, Mr. Danno ordered an appraisal on the property, but the appraiser required a sales contract before the appraisal could be completed. Mr. Danno personally went to look at the property and told Mr. Horn that obtaining the mortgage "would be no problem."

¶ 22    Mr. Horn testified that he specifically asked Ms. Bayzaee to sign a sales contract for his repurchase of the building on June 25, 1995. He testified that she again said that she did not want to sell the building back to him. Mr. Horn said he requested a sales contract from Ms. Bayzaee because Mr. Danno said he needed one to proceed with getting the mortgage approved. Mr. Horn did not present Ms. Bayzaee with a written contract for her to sign. He testified that this was because she had already made clear to him that she would not sell him the building back. Mr. Horn also never asked Mr. Serota to draft a sales contract.

¶ 23    On cross-examination, Mr. Horn acknowledged that Mr. Danno had made no firm commitment—"[h]e expressed confidence pending bringing him a contract." Mr. Horn also agreed on cross-examination that he did not make any *written* demand on the Bayzaees to repurchase the

7

property until 2002. When pressed, Mr. Horn said he made "[s]everal" requests to repurchase the property. He also claimed that, in March 1995, when he asked Ms. Bayzaee why she was not making payments to him on the second mortgage, "she said why should I. We'll just straighten that out when you buy the building back."

¶ 24    Mr. Horn was asked whether there were other times he demanded to repurchase the building, and he stated, "after June 25 of 1995 when we were renewing my lease, but then Ms. Bayzaee instigated—instituted eviction proceedings. And I said I want my building back and she said you will never see that building again." Mr. Horn was asked if he knew that the repurchase option could have been an affirmative defense in the eviction case, and Mr. Horn said that he "did tell Judge Orbach and he said that's none of his business and has nothing to do with this case."

¶ 25    Mr. Serota testified that he and Mr. Horn were childhood friends. He lived at the Kenton property for some time and believed himself to be a part owner of the property. He testified at trial that he did not recall ever conveying his interest in the property to Mr. Horn and believed he still had an interest in the property. The court asked Mr. Serota about a statement in his deposition in which he acknowledged that he sold his interest in the Kenton property to Mr. Horn in the early 1990s; Mr. Serota claimed this was an "oversight" in the deposition because he and Mr. Horn "have had so many businesses together that it's hard to distinguish what was his, what was mine."

¶ 26    Mr. Serota testified that Mr. Horn asked him for assistance in getting financing for the property and Mr. Serota helped him "because I lived there and he was just my friend." Mr. Serota said that he and Mr. Horn did not have enough cash on hand to buy back the property, but Mr. Serota said he would get a mortgage for it. They applied for the mortgage through Mr. Danno. Mr. Serota testified that he had gotten previous loans through Mr. Danno, who was a friend of Mr. Serota's: "I have never had a problem. I never was denied a loan or a mortgage." Mr. Serota did

8

not keep a copy of the mortgage application, but Mr. Danno "just said I will take care of it." Mr. Serota said he got a commitment from Mr. Danno but did not know whether it was written or verbal. Mr. Serota did not remember whether he went to see Mr. Danno with Mr. Horn.

¶ 27    Mr. Serota testified that he also met Ms. Bayzaee in the basement of the Kenton property— they were working on a furnace "and she came down and we were discussing what was happening." Mr. Serota said it was only him, Mr. Horn, and Ms. Bayzaee present, but he did not recall when their discussion took place. According to Mr. Serota, Mr. Horn told Ms. Bayzaee that they were "ready to exercise the option on the building, or something to that effect." Ms. Bayzaee responded, "[y]ou will never get this building back, something to that effect. You will never see this building again."

¶ 28    Mr. Serota acknowledged that he did not send Ms. Bayzaee a sales contract to repurchase the property. Mr. Serota's opinion was that Mr. Horn, with Mr. Serota's assistance, was ready, willing, and able to obtain a loan from Mr. Danno and buy back the property.

¶ 29    Ms. Bayzaee agreed, as the parties had stipulated, that she entered into an agreement to buy the property from Mr. Horn, and that agreement provided that he could repurchase the property from her within one year. Ms. Bayzaee agreed that the oral repurchase agreement did not require Mr. Horn to give Ms. Bayzaee written notice. However, Ms. Bayzaee repeatedly testified that Mr. Horn never asked her to repurchase the property.

¶ 30    Ms. Bayzaee agreed that at one point she had been in the basement of the Kenton property with Mr. Horn and two repairmen. She could not remember when and she did not remember Mr. Serota being present. She did not recall having any conversation with Mr. Horn at that time. Ms. Bayzaee claimed that she did not have a single conversation with Mr. Horn from 1995 until 2002. Ms. Bayzaee said that if Mr. Horn had approached her to repurchase the property for the price she

paid, plus $25,000, she would have accepted it.

¶ 31    Gary Danno testified that he had made Mr. Serota multiple mortgage loans prior to 1995, "possibly three or four different residential loans." He confirmed that Mr. Serota and Mr. Horn approached him in 1995 about getting a mortgage for the Kenton property. Mr. Danno pulled Mr. Serota's credit report because it was "obvious" that Mr. Serota would be the primary borrower. Mr. Danno said Mr. Serota was "very creditworthy" and he "knew [he] was going to be able to obtain the mortgage." Mr. Danno said he "felt very comfortable that [he] was going to be able to get this loan done," but when he ordered an appraisal, the appraiser kept asking for a copy of the sales contract. Mr. Danno remembered "hounding" Mr. Serota, and also Mr. Horn, but no sales contract was ever produced. As a result, Mr. Danno did not believe the appraisal was ever completed. Mr. Danno explained that he did not fill out the application for both Mr. Horn and Mr. Serota because, although Mr. Horn was going to be on the title, he was not going to be on the mortgage. Mr. Danno said he could have "[n]o doubt" gotten the mortgage to allow Mr. Horn and Mr. Serota to repurchase the property. But Mr. Horn would not have been able to obtain a mortgage for the Kenton property alone.

¶ 32    On September 11, 2015, the trial court issued a written order finding that Mr. Horn failed to sustain his burden of proof on his breach of contract claim. The court found that the parties had agreed by stipulation that Mr. Horn had exercised his option to repurchase the property within the required year, but that Mr. Horn had to do more than simply exercise the option. The court stated that Mr. Horn "had to be 'ready, willing and able' to actually repurchase the Kenton Avenue property" and that this required Mr. Horn to show at trial "that when he exercised his option he had 'sufficient funds on hand or the ability to command the necessary funds' to actually consummate the purchase of the property" (quoting *Nelson v. Bolton*, 72 Ill. App. 3d 519, 525

10

(1979)). The court concluded that, because neither Mr. Serota nor Mr. Danno were bound to furnish the funds to Mr. Horn for the repurchase, Mr. Horn had failed to show he was ready, willing, and able to repurchase the property and that Mr. Horn had accordingly failed to show that Ms. Bayzaee had breached their contract.

¶ 33     On October 9, 2015, Mr. Horn filed both a motion to reconsider and a motion to amend his complaint to conform to the proof.

¶ 34     That same day, Mr. Horn also filed a notice of appeal from the trial court's September 11 written order (case No. 1-15-2898). On October 13, 2015, the trial court held that that notice of appeal divested the court of jurisdiction to consider Mr. Horn's postjudgment motions but said that if Mr. Horn withdrew his notice of appeal, the trial court would regain jurisdiction to rule on his motions. Mr. Horn did not withdraw his October 9 notice of appeal, but instead filed a notice of appeal from the court's October 13 order on November 10, 2015 (case No. 1-15-3259).

¶ 35     This court granted Mr. Horn's motions to consolidate those two appeals for consideration, then held that the first notice of appeal did not divest the trial court of jurisdiction to rule on Mr. Horn's postjudgment motions. *Horn v. Bayzaee*, 2017 IL App (1st) 152898-U, ¶¶ 1, 5. We vacated the trial court's October 13 order and remanded the case to the trial court to consider the merits of Mr. Horn's postjudgment motions. *Id.* ¶ 14.

¶ 36     On June 18, 2018, Mr. Horn, through new counsel, filed "briefs in support" of the previously filed motions to reconsider and to amend his complaint to conform to the proof. In his motion to reconsider, Mr. Horn argued that the trial court erred by failing to rule in his favor on count IV with respect to the earnest money. Mr. Horn also argued, for the first time, that the trial court erred in requiring him to show he was ready, willing, and able to repurchase the property at the time he exercised his option. Mr. Horn claimed that such a showing was not required at all.

Mr. Horn also again argued that he was, in fact, ready, willing, and able. Mr. Horn sought to amend his pleadings to add claims of unjust enrichment and breach of fiduciary duty, and "[t]o the extent that it is necessary, if at all, to seek leave to add an additional and broader breach of contract that more specifically pleads anticipatory repudiation."

¶ 37    On November 8, 2018, the trial court denied both Mr. Horn's request for leave to amend his complaint to conform to the proofs and, except as to count IV for the unpaid earnest money, his motion to reconsider. In denying the motion to amend, the court said, "I think too much time has passed. *** This request to amend comes 24 years after the transaction; 13 years—after 13 years of litigation; and after completion of the trial and the appeal." The court also noted that Mr. Horn had many prior opportunities to amend. The court agreed that it should have ruled in Mr. Horn's favor on count IV as to the earnest money.

¶ 38    On July 2, 2019, the court entered a final judgment for Mr. Horn on count IV, awarding him $7000 in unpaid earnest money plus $8746.11 in interest, totaling $15,746.11, and a final judgment in favor of the Bayzaees on the other counts.

¶ 39                              II. JURISDICTION

¶ 40    Mr. Horn timely filed his notice of appeal on July 31, 2019. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 41                              III. ANALYSIS

¶ 42    The parties on appeal agree that they entered into a contract resulting in the sale of the Kenton property from Mr. Horn to the Bayzaees, and that, although it was not memorialized in their written contract, the parties had additionally agreed orally to an option contract whereby, under certain terms, Mr. Horn could repurchase the property from the Bayzaees within one year.

12

Mr. Horn claims, as the trial court found the parties had stipulated, that he exercised this option through an oral request to repurchase the property. We do not see any such stipulation in the record, and Ms. Bayzaee testified repeatedly that this did not occur. However, we will assume, for purposes of our analysis, that the trial court properly found, through stipulation or otherwise, that Mr. Horn timely exercised this option and Ms. Bayzaee responded by refusing to honor the agreement to allow him to repurchase the building.

¶ 43    On appeal, Mr. Horn argues that the trial court erred by (1) applying the ready, willing, and able requirement to the repurchase option; (2) making a factual finding that he was not, in fact, ready, willing, and able to repurchase; and (3) denying Mr. Horn's motion to amend the pleadings to conform to the proofs. We consider each issue in turn.

¶ 44                              A. Standards of Review

¶ 45    Whether the trial court erred by requiring Mr. Horn to show that he was ready, willing, and able to repurchase the Kenton property "is a question of law we review *de novo*." *Metropolitan Capital Bank & Trust v. Feiner*, 2020 IL App (1st) 190895, ¶ 39. Whether the trial court's conclusion that Mr. Horn was in fact not ready, willing, and able, is a challenge to the court's judgment following a bench trial that we review to determine whether it was against the manifest weight of the evidence. *Longo Realty v. Menard, Inc.*, 2016 IL App (1st) 151231, ¶ 19. "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." (Internal quotation marks omitted.) *Id.* Finally, whether a trial court erred in denying a motion to amend the pleadings to conform to the proofs is a question we review for an abuse of discretion. *Compton v. Country Mutual Insurance Co.*, 382 Ill. App. 3d 323, 331 (2008). "An abuse of discretion will be found only where no reasonable person would take the view adopted by the trial

court." (Internal quotation marks omitted.) *Id.*

¶ 46    B. Mr. Horn Was Required to Show That He Was Ready, Willing, and Able to Perform

¶ 47    While the trial court did not accurately articulate its rationale for applying the ready, willing, and able requirement, its instinct that such a requirement was appropriate is quite correct. Indeed, the parties also understood that this was necessary because they tried this case on that basis, although Mr. Horn now claims, as he claimed in his motion to reconsider, that it was not a required showing on his part.

¶ 48    Mr. Horn needed to show that he was ready, willing, and able because his entire claim here relies on what he alleges was Ms. Bayzaee's anticipatory breach of the option agreement. The law is well settled that, for this sort of claim, Mr. Horn had to either tender the money owed for the repurchase or, at a minimum, prove that he was ready, willing, and able to do so. As we have made clear:

> "An actual tender before filing suit for specific performance is unnecessary where a defendant has repudiated the contract. [Citations.] Although actual tender is not required, [a] plaintiff must show it is ready, willing, and able to perform its part of the agreement. [Citation.] 'It should be enough to allege and prove that had it not been for the repudiation, [the nonrepudiating party] would have performed or been ready and willing to do so.' " *Curtis Casket Co. v. D.A. Brown & Co.*, 259 Ill. App. 3d 800, 807-08 (1994) (quoting 11 S. Williston, Williston on Contracts § 1334, at 177 (3d ed. 1968)).

¶ 49    As various treatises have explained, there can be no right to damages for an anticipatory breach without a showing that but for the anticipatory breach, the contract would have been performed. As Williston puts it, "[t]o recover damages, in addition to proving repudiation, the nonbreaching party need only show that it would have been ready and willing to have performed

the contract, if the repudiation had not occurred." 23 Williston on Contracts § 63:44 (4th ed. 1999).

The Restatement of Contracts also makes clear that "[a] party's duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise." Restatement (Second) of Contracts § 254(1) (1981). An illustration from the Restatement presents the obvious rationale for such a rule:

> "On April 1, A and B make a personal service contract under which A promises to employ B for six months beginning July 1 and B promises to work for A during that period. On May 1, A repudiates the contract. On June 1, B falls ill and is unable to perform during the entire period. A's duty to pay B damages for total breach by repudiation is discharged."
> Restatement (Second) of Contracts § 254 (1981).

¶ 50      Mr. Horn is correct that there is no blanket requirement that a plaintiff seeking to enforce an option contract must demonstrate that he is ready, willing, and able to exercise the option. He is also correct that the ready, willing, and able requirement is not necessary whenever a plaintiff simply seeks specific performance. As we made clear in *Artful Dodger Pub, Inc. v. Koch*, 230 Ill. App. 3d 806, 810-11 (1992), there is no general requirement "that a purchaser must show he was ready, willing, and able to perform the contract by proving he had sufficient assets to purchase the property. The acceptance of an option contract is valid when the parties meet all of the terms of the option." However, in this case, unlike in *Artful Dodger*, the breach was anticipatory, and Mr. Horn's entitlement to damages—now that specific performance is not available—depended on his showing that when he made the demand and that demand was refused, he was ready to go through with his end of the bargain.

¶ 51      Mr. Horn's other arguments are not persuasive. He argues that the breach was Ms.

Bayzaee's failure to pay the earnest money as required by the written contract for the sale of the building rather than Ms. Bayzaee's anticipatory refusal to allow him to repurchase the property. However, the failure to pay the earnest money was a separate claim for breach on which Mr. Horn prevailed on his motion to reconsider. It had nothing to do with the option agreement and there is absolutely no evidence in the record that Ms. Bayzaee's failure to pay the earnest money had any impact on Mr. Horn's readiness to exercise his repurchase option or that the Bayzaees' breach of the option contract was anything other than anticipatory.

¶ 52    Mr. Horn also argues that Ms. Bayzaee's conduct waived any requirement that he be ready, willing, and able to perform because she did not write this requirement into the sales contract that she drafted. However, the ready willing, and able requirement applies here not because it was an agreed-to term of the parties' contract but because of the nature of the breach. As explained above, where a breach is anticipatory, the plaintiff simply cannot prove damages without a showing that he or she was ready, willing, and able to perform. *Curtis Casket Co.*, 259 Ill. App. 3d at 807-08.

¶ 53    In a related argument, Mr. Horn claims that it was Ms. Bayzaee's fault that he did not obtain financing because she did not draft a sales contract for him to repurchase the building after he asked her to do so. However, there is nothing in the record that suggests it was Ms. Bayzaee's responsibility to draft an agreement, that Mr. Horn or one of his potential financiers could not have drafted one, or that Mr. Horn ever specifically asked Ms. Bayzaee to draft an agreement. Again, the burden of proof was on Mr. Horn to show that he was ready, willing, and able to make the purchase, and Ms. Bayzaee's lack of cooperation in his efforts to repurchase do not entitle him to damages unless he can make this showing.

¶ 54    In short, although there was no agreement by the parties that Mr. Horn had to be ready, willing, and able, and although this requirement does not automatically apply whenever a plaintiff

seeks specific performance, the trial court was right to require that showing here because the only relevant breach was Ms. Bayzaee's alleged statement that she would not perform as promised. That statement cannot give rise to a claim unless Mr. Horn either performed himself or, at a minimum, proved to the court that he was ready, willing, and able to do so.

¶ 55    C. The Trial Court's Finding That Mr. Horn Was Not Ready, Willing, and Able Was Not

Against the Manifest Weight of the Evidence

¶ 56    Mr. Horn alternatively argues that he was in fact ready, willing, and able, and that the trial court's finding to the contrary was against the manifest weight of the evidence.

¶ 57    The trial court found that Mr. Horn had failed to prove that he was ready, willing, and able because his ability to pay the repurchase price was dependent on actions by third parties—Mr. Serota and Mr. Danno—who were not legally bound to furnish him the funds to make the purchase. The trial court cited a line of Illinois cases holding that a buyer is not ready, willing, and able "if he is depending upon third persons who are in no way bound to furnish the funds." *Nelson*, 72 Ill. App. 3d at 525 (citing *Epstein v. Howard*, 5 Ill. App. 2d 553, 558 (1955)).

¶ 58    Mr. Horn argues, citing *Gordon v. Bauer*, 177 Ill. App. 3d 1073, 1095 (1988), that a plaintiff need not show that his lender is legally bound to furnish the funds necessary for the plaintiff to be ready, willing, and able to perform, so long as he can show that the loan would have been approved. However, *Gordon* is fully in line with and cites to the *Epstein* line of cases. The result in *Gordon* turned on the court's finding in that case that the borrower was *not* relying on the financial ability of a third party to consummate the transactions and that, in fact, the buyer had a sufficient net worth on his own to consummate the deal. *Gordon*, 177 Ill. App. 3d at 1096.

¶ 59    Mr. Horn's other response is, as noted above, that his inability to obtain a commitment to financing was due to Ms. Bayzaee's refusal to draw up a real estate contract. Mr. Horn claims that

17

without this contract he could not obtain an appraisal, and without the appraisal he could not get a binding commitment for the necessary funds. But as the trial court found:

"[N]o testimony was ever elicited that [Mr.] Serota[,] a person who allegedly had an interest in the property—was present when [Mr.] Horn did so or had ever requested a sales contract from Ms. Bayzaee himself. Finally, no testimony was ever elicited from either [Mr.] Horn or [Mr.] Serota—a much more sophisticated investor—that one or the other of them ever prepared a repurchase sales contract on their own which was tendered to Ms. Bayzaee and rejected.

At best, [Mr.] Danno's words to [Mr.] Serota and [Mr.] Horn indicated that the funds would be forthcoming if certain conditions were met, but they never were."

¶ 60    In sum, the trial court's factual finding that Mr. Horn was not ready, willing, and able to complete the repurchase agreement because he had neither the necessary funds nor a binding commitment from someone else to provide those funds was not against the manifest weight of the evidence.

¶ 61    D. The Proposed Amendments Were Untimely and Would Not Have Cured the Defects

¶ 62    Section 2-616(c) of the Code of Civil Procedure provides that "[a] pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs." 735 ILCS 5/2-616(c) (West 2014). When determining whether to grant such a motion, a trial court considers the following: "whether the allowance of the amendment furthers the ends of justice," which includes "whether the amendments alter[ed] the nature of proof required to defend and whether the other party would be prejudiced or surprised." (Internal quotation marks omitted.) *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 85. In addition, "[d]espite the broad language of section 2-616(c), courts have ruled that the question of whether an amendment should be allowed is

addressed to the discretion of the trial court and that it is not an abuse of discretion to deny a motion for leave to amend when the proposed amendment would not cure the defect in the pleading." *Jessen v. Sverdrup & Parcel and Associates, Inc.*, 218 Ill. App. 3d 901, 904 (1991). There was no abuse of discretion by the trial court in this case.

¶ 63     First, the trial court largely based its denial of Mr. Horn's motion for leave to amend on the vast amount of time that had passed—24 years since the transaction, 13 years since the filing of this suit, and following two appeals and a full trial. Denying Mr. Horn leave to amend his complaint again at this late stage was certainly reasonable.

¶ 64     Also, Mr. Horn's proposed amendments would not have cured the problem in this case. His request to specifically plead anticipatory repudiation was, as he recognized in his motion, not necessary. This was pleaded and tried as a breach of contract case and the anticipatory repudiation was simply the manner in which Mr. Horn claimed that Ms. Bayzaee breached the contract. This amendment was not needed to cure any defect in the pleading. And Mr. Horn has made no showing that his other proposed claims would have eliminated his need to prove that he was ready, willing, and able to repurchase the building or how they would have cured any defect in the pleading.

¶ 65     As a final matter, Mr. Horn also argues on appeal that the trial court erred by denying his motion to reconsider. We review a trial court's ruling on a motion to reconsider for an abuse of discretion. *Brandenberry Park Condominium Ass'n v. Abu Taleb*, 2020 IL App (1st) 200442, ¶ 20. In his motion to reconsider, Mr. Horn argued for the first time that he was not required to show he was ready, willing, and able, and that the trial court had erred in finding otherwise and also in finding that he was not ready, willing, and able. But for all the reasons we have articulated above, we find the trial court was correct in both of these conclusions, and thus it did not abuse its discretion in denying Mr. Horn's motion to reconsider.

¶ 66                                   IV. CONCLUSION

¶ 67    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 68    Affirmed.